STATE of Minnesota, Respondent,

v.

Timothy M. ELING, Appellant.

No. C7–83–558.

Supreme Court of Minnesota.

Aug. 24, 1984.

C. Paul Jones, Public Defender, Kathy King, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Tom Foley, Ramsey County Atty., Steven C. DeCoster, Asst. County Atty., St. Paul, for respondent.

WAHL, Justice.

Defendant Timothy Eling was convicted by jury verdict in Ramsey County District Court of two counts of murder in the first degree in violation of Minn.Stat. §§ 609.-185, subd. 1, 609.185, subd. 3, and 609.05 (1982) in the shooting death of security guard Richard Walton during an aggravated robbery at the pharmacy of Mounds Park Hospital. Defendant argues on appeal that probable cause was lacking for his warrantless arrest and for a subsequently issued warrant authorizing the search of his residence. He also argues that his right to a fair trial was denied by the admission of prior convictions during the trial and by his appearance in handcuffs before jurors and that he was denied the effective assistance of counsel. We affirm.

On Sunday, October 24, 1982, at approximately 8:50 p.m., three men wearing ski masks and carrying guns entered the pharmacy of Mounds Park Hospital in St. Paul, Minnesota. One of the men wore a bright orange ski mask; another held a "hand radio." One of the pharmacy personnel saw the men coming in time to notify the switchboard to send the guard. The gunmen ordered two hospital employees to get down on the floor and a third to get the "Class A" drugs. Richard Walton, an off-duty police officer who was working at the hospital as a part-time uniformed security guard, answered the call for help. As he approached the pharmacy, one of the men assumed a "shooting stance" and fired at him through the window. After an exchange of shots, the men ran from the

pharmacy. Walton was discovered lying on the floor outside the pharmacy near the elevator. He died approximately 12 hours later from a single gunshot wound to the head.

Witnesses at the scene described the three robbers as white males, five foot eleven, and of medium build. The drugs the robbers sought were Schedule II, addictive-type drugs. The police found a trail of blood leading from outside the pharmacy to an exit. They also found a light blue 1969 Ford within 2 blocks of the hospital, parked at a 45° angle to the curb, with its doors open, the key in the ignition and the gear shift still in the "drive" position. The police found blood on the rear seat and on the lower front of the rear seat, which led them to believe that one of the robbers had been shot in a lower extremity, probably a leg. William Galles, a nearby resident, approached the police while they were investigating the Ford and told them he had seen the same car parked near the entrance of the hospital closest to the pharmacy on Friday evening, October 22.

The Tuesday after the robbery, a citizen informant told Sergeant James Frank of the St. Paul Police Department that a man named Bill Dwyer had "specific knowledge" of the robbery because Dwyer had been involved in an earlier stage of the same robbery. Dwyer and the other men had arrived at the hospital to rob the pharmacy Friday evening, October 22, but Dwyer had backed out, and the robbery was called off. The citizen also told Frank that one of the robbers, whose name was "Tim," had been shot, that Dwyer's address was 99 W. California in St. Paul, and that the source of the citizen's information was Dwyer's sister. The citizen called back one day later to say that the last name of "Tim" was "Eling." Sergeant Frank subsequently verified as correct the information the citizen informant gave regarding his name, address and phone number. Frank also ascertained that the citizen had no felony convictions. Following up on the citizen's naming of Dwyer as a person with "specific knowledge," Frank contacted Stillwater Prison and ascertained that, while there, Dwyer had associated with a Tim Eling, a Clifford Clark, a Harold Gustafson and a man with the last name of Roth. Frank also ordered surveillance of 1219 Cypress, shown by police department records to be Eling's current address.

On Wednesday, October 27, an FBI agent contacted Captain Nord of the Robbery Unit to relay information obtained from a "confidential, reliable informant." To substantiate the informant's reliability, the agent explained that he had used the informant's information about 75 times and that some of the information had led to federal convictions and recovery of over $175,000 worth of stolen property. The agent then relayed information that one of the three robbers was Timothy Michael Eling, that one man had worn a bright orange ski mask, and that Eling had two addresses, the more recent one being 1219 Cypress, St. Paul. Captain Nord checked police records, which indicated that Eling fit the general description of the robbers and that Eling had been involved in the past in aggravated robberies and in drug-related offenses.

On Wednesday, October 27, between 12:30 and 1 p.m., the police located Dwyer, who disclosed the following information: the names of the three men involved in the robbery; a description of their weapons and clothing; the "throwaway" car was a blue 1979 Ford; two of the ski masks were dark or multicolored, and one was bright orange; Dwyer had been with the three men Friday evening at the hospital to rob the pharmacy but had called it off; and Tim Eling had been shot in the leg during the robbery on Sunday.

Several police units had been ordered to set up surveillance on Eling at 1219 Cypress. One officer observed Eling limping and also observed him driving in unusual or circuitous routes, as if to "shake a tail." On Wednesday, October 27, at approximately 1:15 p.m., Eling was arrested pursuant to an order given over the police radio. After his arrest, Eling was taken to the

hospital, where his leg injuries were examined and pictures and X-rays were taken of his leg.

Later that evening, the police executed a search warrant issued for defendant's residence and seized in total the following items:

one white stocking, one Physicians' Desk Reference, one brown leather coat, two pair of jeans, two Realistic Walkie-Talkies, one ski mask, three envelopes containing miscellaneous paper, a key to Room 8 of the Kraiger Motel, one driver's license of Timothy Eling, one box of .22 long rifle ammunition, four boxes of compress bandages, one yellow pillowcase, one towel, and one Sears scanning receiver.

The defendant was charged by indictment with both the intentional, premeditated killing of Richard Walton and with his intentional killing while committing aggravated robbery. Defendant pled not guilty. His attorneys challenged at the pre-trial hearing defendant's warrantless arrest, the search of his home and a post-arrest statement. The trial court found that evidence seized incident to warrantless arrest and the search of the home pursuant to warrant was admissible because both the arrest and the search had been supported by probable cause. The court suppressed defendant's post-arrest statement.

At trial, defendant's counsel placed on the record defendant's claim that he had been brought to the courtroom in handcuffs and that jurors had seen him in handcuffs. Defendant relied on the defense of alibi, thus placing in issue his presence at the crime scene. Thereafter the trial court permitted the state, in rebuttal, to introduce evidence of defendant's two prior robbery convictions. Defendant's counsel, in chambers and on the record, had previously warned him that if he insisted in presenting alibi witnesses, the court would, in her legal opinion, allow in the prior convictions. Defendant was convicted. This appeal followed.

■ 1. Defendant argues first that admission of evidence obtained as a result of his warrantless arrest was reversible error because the state failed to meet its burden of showing sufficient probable cause for that arrest. In order to establish that probable cause existed for a warrantless arrest, the state must show that, at the time of the arrest, the police had factual information obtained from reliable sources, from which they could conclude that there was probable cause to believe the defendant had participated in a felony. *State v. Merrill*, 274 N.W.2d 99, 108 (Minn.1978). The test in Minnesota, under the "collective knowledge" approach, is whether the pooled knowledge of the entire police department is sufficient to establish probable cause. *State v. Conaway*, 319 N.W.2d 35, 40 (Minn.1982). When a police officer is ordered to make an arrest, the officer may assume that the police department has made a valid probable cause determination. *See id.*

■ Defendant attempts to show that probable cause could not have existed because Dwyer's information had not yet been communicated to the police department, i.e., the police had bootstrapped probable cause. At the pre-trial hearing, the state presented a litany of facts that the police had at the time of the arrest. Those facts establish that, even without Dwyer's information, the police had evidence from several independent sources, plus their own observations, from which they could reasonably conclude that defendant participated in the Mounds Park robbery. *See, e.g., State v. Conaway*, 319 N.W.2d at 41 (circuitous route is corroborative evidence); *State v. Siegfried*, 274 N.W.2d 113, 115 (Minn.1978) (information given by first-time citizen informant is presumed reliable); *United States v. McGlynn*, 671 F.2d 1140, 1143 (8th Cir.1982) (finding of trial court that police had probable cause for arrest may not be set aside unless clearly erroneous). Defendant also challenges the use of the FBI informant's information for two reasons: 1) the informant's reliability was not established, and 2) some details were not accurate. Contrary to defendant's first point, the FBI agent had specified reasons

to consider the informant reliable. *See State v. Saver*, 295 Minn. 581, 205 N.W.2d 508 (1973). As to defendant's second point, in considering the existence of corroborative evidence, the inquiry ordinarily deals with the major details of an informant's story. *See State v. Lindquist*, 295 Minn. 398, 401, 205 N.W.2d 333, 335 (1973). In *State v. Conaway*, the court said, "[t]he operative question is whether the police, as a collective body, have knowledge of information that belies probable cause at the time of the arrest." 319 N.W.2d at 40. No fact appears on the record to negate a finding of probable cause to arrest defendant. We hold that sufficient probable cause supported defendant's warrantless arrest and that evidence obtained as a result of that arrest was properly admitted into evidence.

**2.** Defendant next argues that there was insufficient information in the search warrant affidavit for crediting the hearsay information of the informants and that, therefore, the search warrant for his residence was invalid. The trial court held that the reliability of a citizen informant generally is to be presumed and that the FBI agent was passing along not only the "tip" but also the information that this agent considered the informant to be reliable. Any possible lack of information as to informant reliability is not fatal where, as here, there is other corroborative evidence sufficient to establish credibility. *See State v. Lindquist*, 295 Minn. at 401, 205 N.W.2d at 335; *State v. Daniels*, 294 Minn. 323, 200 N.W.2d 403 (1972). The trial court found that "[t]he operative facts * * * [were] a full recitation of the events of the robbery and [of the] shooting * * *, one of the parties being wounded at the time, * * * the defendant limping[,] * * * [and] that the defendant was arrested." Moreover, the affidavit explained that the subsequent examination of defendant had shown a leg wound consistent with a gunshot wound. We find no lack of probable cause for the warrant for the search of defendant's residence. Evidence obtained as a result of that search was properly admitted.

**3.** Defendant argues strongly that admission of testimony regarding his prior convictions as rebuttal was error. As defendant recognizes, the determination of what constitutes proper rebuttal evidence rests almost wholly in the discretion of the trial court. *State v. Collins*, 276 Minn. 459, 150 N.W.2d 850, 860 (1967), *cert. denied*, 390 U.S. 960, 88 S.Ct. 1058, 19 L.Ed.2d 1156 (1968). In this case, defendant did not take the stand to testify in his own behalf, but he did insist, against the advice of his attorney, that the defense call several family members and friends of the family to give alibi testimony. Those persons testified in general terms that defendant had been with them the evening of the robbery and that he had a leg injury the day before the robbery. Because the robbers wore ski masks and because defendant's identity was established by circumstantial evidence alone, the prosecution moved in rebuttal to buttress its case on identity by introducing prior-crime evidence. Because the alibi testimony placed defendant's identity in issue, the trial court determined that it would be proper to allow the prosecution to introduce prior-crime evidence concerning defendant's convictions in 1972 and 1974 for armed robbery. The state then presented testimony of eyewitnesses to both crimes, testimony of the investigating officers in both crimes and introduced the transcript of defendant's guilty plea to the 1972 robbery. Defendant contends that such rebuttal testimony did not refute evidence he had presented as to his specific location at the time of the Mounds Park incident but, rather, merely tended to show a general disposition to criminal conduct.

Faced with the question of whether prior-crime evidence is admissible, the trial court must determine whether the relevance of the evidence is sufficient to outweigh its potential for prejudice. *State v. Filippi*, 335 N.W.2d 739, 743–44 (Minn. 1983). As defense counsel had warned, the prior-crime evidence was potentially ruinous to the defense. In 1972 and 1974,

defendant was convicted of armed robberies of the Richfield Pharmacy and the Griswold Drug Store respectively. In the first robbery, defendant and another man carried guns and ordered customers to lie down. Although the pharmacist testified that defendant did not demand "Class A" drugs or say, "don't push the button," a cashier who was present testified that defendant used the term "Class A" drugs. In the second robbery, defendant carried a handgun, said, "don't push any buttons," demanded "Class A" drugs, mentioning certain drugs by name, then ordered the pharmacist to lie down on the floor. Before being permitted to introduce the evidence, the prosecution argued that the following prior-crime facts from these two robberies established a pattern of conduct which, in turn, would establish identity: robbing drug store pharmacies for "Class A" drugs; carrying guns; ordering the pharmacists to get the "Class A" drugs; ordering the pharmacists to not "push the button"; having the persons present lie on the floor.

Generally, the prosecution must demonstrate a tangible similarity between the prior crime and the charged offense in terms of time, location, or *modus operandi*. *State v. Filippi*, 335 N.W.2d at 743. There was testimony on the record that the term "Class A drugs" was an anachronism. The federal designation for addictive narcotics was changed several years before from Class A to Schedule II drugs. Given the similarities in the *modus operandi* of the three robberies, we cannot say that the trial court erred in admitting prior-crime evidence. Additionally, we note that the defendant had actual notice of the state's intention to introduce the prior-crime evidence and that there was no surprise to defendant. *State v. Coles*, 328 N.W.2d 157 (Minn.1983).

4. We next consider defendant's claim that he was denied his right to a fair trial where, while handcuffed, he was brought to and taken from the courtroom in possible view of the jurors. We have been adamant that in-court restraints should not be ordered or permitted unless there has first been a showing of eminent necessity, and then only those restraints which are reasonable and least coercive should be imposed. *State v. Stewart*, 276 N.W.2d 51, 61 (Minn.1979). We have recognized the propriety, however, where security measures require it, of "bringing a prisoner to court in manacles, provided appropriate steps are taken to minimize his exposure to the jury's view and the handcuffs are removed before he enters the courtroom." *State v. Klinkert*, 271 Minn. 548, 549, 136 N.W.2d 399, 400 (1965). The trial court in this case determined that, because the trial was a murder trial, defendant had seven prior felonies, two persons involved in the shooting were not in custody, there had been documented threats to witnesses, and witnesses feared defendant and his friends, security measures were necessary. Two armed deputies in plain clothes sat in the courtroom. All persons entering the courtroom were searched, and two signs in the hallway warned that those entering were subject to search. Defendant was not subject to in-court restraints but was handcuffed going from the jail to the courtroom. His claim is that, while being brought in handcuffs from the jail up the elevator through the hallway to the courtroom by the bailiffs, he was seen by jurors who were also in the hallway. Defense counsel advised the court that her client had informed her that he had been led out at noon in handcuffs in front of the jury. Defense counsel made no request, under Minn.R.Crim.P. 26.03, subd. 2c, however, that the judge instruct the jurors that defendant's restraint by handcuffs was not to be considered in assessing the proof and determining guilt. Such a request, in the absence of evidence that any jurors saw the handcuffs on defendant, might well have highlighted the fact of the restraints. It is clear from the record that the trial court took reasonable steps to minimize defendant's exposure in handcuffs to the jury's view but could not eliminate all risk. Defendant was not thereby denied a fair trial.

5. Finally, we consider defendant's claim that he was denied effective assistance of counsel. The right to counsel is the right to effective assistance of counsel. *United States v. Cronic,* — U.S. —, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *McMann v. Richardson,* 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970). Effective assistance of counsel, we said in *White v. State,* 309 Minn. 476, 481, 248 N.W.2d 281, 285 (1976), is "representation by an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." To be reasonably effective, it is not required that representation by counsel obtain a favorable result, *White, Id.,* but that counsel provide for the accused the "guiding hand" the Sixth Amendment envisions in subjecting the prosecution's case to meaningful adversarial testing. *Cronic,* — U.S. at —, 104 S.Ct. at 2043, n. 8. The ultimate purpose of such representation is that the adversarial process function properly to insure a fair trial and a just result. *Strickland v. Washington,* — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on his ineffectiveness claim, defendant must show that his counsel's representation was not reasonably effective. To do so he must demonstrate not only that certain conduct or errors of counsel were unreasonable, but that he was constitutionally prejudiced thereby. We note that the *Strickland* court has adopted as the standard for prejudice the requirement that a defendant show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," defining "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Strickland,* — U.S. at —, 104 S.Ct. at 2068.

Defendant has alleged generally that he was denied effective assistance of counsel and specifically that counsel did not adequately prepare and investigate all aspects of his defense and did not adequately challenge the warrantless arrest and search warrant. Our painstaking review of the records and transcripts in this case reveals no basis for these claims. Defendant was ably represented by two attorneys from the office of the Ramsey County Public Defender. His counsel effectively cross-examined state's witnesses at the pre-trial suppression hearing, called an officer witness, vigorously argued the law and succeeded in getting a post-arrest statement suppressed, objected to signs in the hallway which warned the public that persons entering the courtroom were subject to search, made repeated efforts to interview a witness under protective order, obtained sequestration of witnesses and of potential jurors, objected to state's witnesses testifying to defendant's prior use of drugs and called a witness who could counter such testimony when the motion was denied, conducted a good cross-examination of state's witnesses at trial, in presentation of defense case called the strongest witnesses first to establish credibility, and put on record that defendant was led in front of jurors in handcuffs.

There were perhaps three instances of defense counsel action which might arguably support defendant's claim. The first was defense counsel's failure to request a cautionary instruction regarding the possibility of defendant's appearing in handcuffs in view of the jurors. As we have noted, this may have been a conscious decision by defense counsel to avoid calling attention to the fact that defendant was restrained. Such decisions are regularly made and are accepted as matters of trial tactics. The second instance of possible ineffective assistance of counsel appeared in defense counsel's opening statement. In describing to the jury the alibi evidence which would be presented, defense counsel said the following:

Now, I wish I could provide you with an ironclad alibi in this case. I can't. I wish I could say Mr. Eling was locked up or was in a convent or something else. I can't do that.

What we will present are friends and family. Now, it is my understanding that there is a woman by the name of

Linda Lundberg. She is going to tell you an absolutely ridiculous story. She is going to say that several days prior to this incident Mr. Eling came to her house with his friend, Eileen Kealy, Eileen F. Kealy, and that his leg was bothering him. He asked her to help change the dressing on his leg, and when she asked what happened, he said, "A dog bit me." Totally incredible, but we are presenting that evidence, nevertheless, because·she did see the wound.

An attorney may not assert his or her personal opinion as to the credibility of a witness or as to the guilt or innocence of the accused. Minn.Code of Prof. Resp. DR7-106(C)(4). *Cf. State v. Wiplinger,* 343 N.W.2d 858 (Minn.1984) (defense counsel on cross-examination impliedly admitted defendant's guilt without defendant's permission or acquiescence). This opening statement, however, followed the submission of a very strong case by the state. It appears from the record that defense counsel judged defendant's alibi witnesses as very weak and advised defendant against putting on alibi testimony. When defendant insisted, defense counsel was faced with the problem of presenting poor alibi testimony in the best light. The state had presented clear-cut evidence that the injury to defendant's leg was a gunshot wound. Defense counsel, as a matter of strategy, may have been preparing the jurors to accept Lundberg's statement that defendant had a leg injury several days before the robbery, notwithstanding his unlikely explanation for the injury. We do not find the defense counsel's statement sufficient to constitute ineffective assistance of counsel.

The final colorable claim of ineffective assistance of counsel concerns an on-the-record conversation in chambers between the defendant and defense counsel with the trial judge and the prosecuting attorney present. The events leading to the conversation in chambers are not known. From the record, it appears that defendant requested the conference to protest the handling of his case to the judge, while defense counsel wanted to make a record about the disagreement of counsel and client over the conduct of the defense case. The two disagreed as to whether or not to present alibi witnesses. Defense counsel advised the defendant that, in her legal judgment, the alibi testimony would not appreciably help defendant's case, while, at the same time, it would give the state an opportunity to present extremely damaging prior-crime evidence. Defendant was clearly agitated by this advice but insisted that the alibi witnesses be called. The ABA Standards for Criminal Justice provide the following guidelines where disagreement occurs over the control and direction of a case:

(b) The decisions on what witnesses to call, whether and how to conduct cross examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with the client.

(c) If a disagreement ˙on significant matters of tactics or strategy arises between the lawyer and the client, the lawyer should make a record of the circumstances, the lawyer's advice and reasons, and the conclusion reached. The record should be made in a manner which protects the confidentiality of the lawyer-client relationship.

ABA Standards for Criminal Justice, § 4–5.2 (2d ed. 1980).

◼◼◼ The making of such a record is suggested as a precaution should the defendant later raise the issue of ineffective assistance of counsel in a post-conviction hearing. Here, a record was made in chambers with the judge and prosecuting attorney present, a situation which may make difficult the preservation of the confidentiality of the attorney-client relationship. A similar situation may arise where the defendant refuses to testify and defense counsel determines that it is necessary to document knowing and voluntary waiver. *See* A. Amsterdam, B. Segal and M. Miller, Trial Manual for the Defense of Criminal Cases § 392 (3d ed. 1974) (hereinafter Amsterdam). Amsterdam reminds

us that the trial judge is also the sentencing judge and may react adversely to the fact that counsel feels it necessary to protect himself against the defendant. It is also possible that being questioned in the presence of the prosecuting attorney may have caused the defendant to hesitate to communicate openly with his attorney. This conversation took place at a critical point in the trial. The state had rested, and it was time for the defense to present its opening argument. It was critical that the defendant understand the relationship between the defense's use of alibi testimony and the state's use of prior-crime evidence. It is not clear, however, from reading the transcript of this exchange, that defendant did *not* understand that relationship.

We note that the making of a record regarding a dispute over conduct of the case has been a longstanding problem. *See, e.g., Ebert v. State,* 284 N.W.2d 548 (Minn.1979) (in 3½-year interval between trial and hearing on appeal, the tape recording of conversation was lost). Additionally, we note that there are instances where, with the jury excused and defense counsel present, it is necessary for the trial court to question a defendant regarding the defendant's concurrence in some aspects of the case. *See, e.g., United States v. Janoe,* 720 F.2d 1156, 1161–62 (10th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1310, 79 L.Ed.2d 707 (1984) (trial judge directly questioned defendant 6 days prior to trial, in chambers with defense counsel present, to ascertain that defendant in fact preferred substitution of counsel to continuance of trial where original attorney had schedule conflict and second attorney was "somewhat familiar" with case); *United States v. Von Roeder,* 435 F.2d 1004, 1008 (10th Cir.1970) (trial court held hearing in courtroom in absence of jury where defendant suddenly wished to testify and counsel asked to be allowed to withdraw should defendant testify). It is difficult to envision a circumstance, however, where the prosecuting attorney should ever be present at an on-the-record conversation between a defendant and defense counsel.

We do not specify a single, appropriate manner of making a record in such cases.[1] We do encourage that means which best serves to protect both the confidentiality of the attorney-client relationship and the safeguards present in the criminal system. In this case, we find no basis for a claim of ineffective assistance of counsel, particularly where defendant requested the conference with the court.

We affirm defendant's conviction of murder in the first degree.

Affirmed.

---

1. Amsterdam's Trial Manual posits that post-hearing complaints of ineffective assistance of counsel should be accepted as a fact of life and that a simple memo to the file will suffice. It would also be possible to make a record in chambers before the court reporter in the absence of the judge and prosecuting attorney.