**Shawn Allen McCOLLUM, Petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**Nos. C2–00–1056, C9–01–1274.**

Supreme Court of Minnesota.

March 21, 2002.

Susan K. Maki, Asst. State Public Defender, Minneapolis, MN, for appellant.

Mike Hatch, Attorney General, St. Paul, MN, Michael K. Junge, McLeod County Attorney, Glencoe, MN, for respondent.

## OPINION

LANCASTER, Justice.

On March 29, 2000, a jury found appellant Shawn Allen McCollum guilty of mur-

der in the first degree while committing kidnapping, in violation of Minn.Stat. § 609.185(3) (2000), murder in the second degree, in violation of Minn.Stat. § 609.19, subd. 1(1) (2000), and kidnapping, in violation of Minn.Stat. § 609.25, subd. 1(3) (2000), for his role in the kidnapping and death of Randy Pool in Hutchinson, Minnesota, between July 18 and 21, 1999. At the sentencing hearing, the court entered a conviction for first-degree murder while committing kidnapping and sentenced McCollum to life imprisonment without possibility of release. McCollum appealed and later filed a motion, which we granted, to stay his direct appeal for the purpose of instituting postconviction proceedings.

McCollum's petition for postconviction relief sets forth two claims. First, that his conviction should be reversed and he be granted a new trial because the trial court did not inform him of his right to instruct the jury that it may not attach an adverse inference to the fact that he did not testify at trial. Second, that his sentence should be modified to include the possibility of release because the indictment did not refer to the heinous crimes statute, Minn. Stat. § 609.106, subd. 2(2) (2000). The postconviction court denied his petition. McCollum then appealed the judgment denying his petition for postconviction relief and filed motions to vacate the stay of his direct appeal and to consolidate the appeals. We granted those motions. This case, therefore, comes to us on direct appeal and appeal of the judgment denying postconviction relief. We affirm.

The facts giving rise to McCollum's conviction are as follows. In early 1999, Salem Bernhardt and Heather Ecklund began living with Pool in Pool's house in Hutchinson, Minnesota. Bernhardt sold methamphetamine from Pool's house. In June 1999, Bernhardt and Ecklund planned a trip to visit friends and family in Nebraska and Indiana. Bernhardt asked McCollum to look after the drug business during Bernhardt's absence. McCollum then moved into Pool's house. In early July 1999, Bernhardt and Ecklund traveled to Nebraska to visit Jason and Tanya Caldwell (J. Caldwell and T. Caldwell, respectively). On July 10, 1999, Bernhardt returned to Hutchinson with J. Caldwell. Four days later, the Hutchinson Police Department received a tip from Lance Mattson that J. Caldwell was at Pool's house. Mattson knew that there was an outstanding warrant for J. Caldwell's arrest.

That evening, Hutchinson police officers went to Pool's house. Officer Johnson and Officer Nadeau spoke to Pool outside the house, learned that J. Caldwell was inside the house, and asked Pool to bring J. Caldwell out of the house. Pool entered the house and returned with J. Caldwell. After Officer Nadeau confirmed J. Caldwell's identity and the existence of a warrant for his arrest, J. Caldwell passed a large wad of bills to Pool. Officer Nadeau then placed J. Caldwell in handcuffs and searched him. Officer Nadeau found a plastic bag that contained a white powdery substance in one of his pockets and brought him to the police station for booking.

Officer Johnson remained at Pool's house. Sergeant Jones arrived to assist Officer Johnson after Officer Nadeau left. Sergeant Jones and Officer Johnson told Pool that they may have to seize the money that J. Caldwell passed to him because of the discovery of apparent narcotics on J. Caldwell. Pool stated that the money was in the house. Pool entered the house and returned a few minutes later with some money. Officer Johnson noticed that Pool returned with less money than J. Caldwell had passed to him. Pool admitted that he

kept some of the money for J. Caldwell's bail. Pool agreed to retrieve the remainder of the money. Pool appeared very nervous to the officers. When asked whether he was hiding something or someone in the house, Pool responded that Bernhardt was in the house and that there were outstanding warrants for Bernhardt's arrest.[1]

Pool consented to the police officers' search of the house. Pool advised the officers that Bernhardt was upstairs. Sergeant Jones found Bernhardt in an upstairs bedroom closet. The officers arrested Bernhardt and brought him to the police station. Officers found controlled substances, a scale, and approximately $2,500 in their search of Pool's house.

Ecklund and T. Caldwell learned of Bernhardt's and J. Caldwell's arrests that day and returned to Hutchinson on July 18, 1999. That afternoon, Ecklund visited Bernhardt at the McLeod County jail. Bernhardt asked her to find out who had turned J. Caldwell and him in to the police. That evening, Ecklund and T. Caldwell went to Pool's house. Ecklund, T. Caldwell, Pool, and McCollum went upstairs. Richard Ligenza arrived a few minutes later.

Ecklund, T. Caldwell, and Ligenza questioned McCollum and Pool about Bernhardt's and J. Caldwell's arrests, missing money, and drugs. The questioning then focused on Pool and turned violent. Ecklund, McCollum, and Ligenza hit Pool. Pool tried to escape by running downstairs, but McCollum tripped him and slammed him to the floor. Ecklund, McCollum, Ligenza, and possibly T. Caldwell bound Pool's arms and legs with plastic ties and duct tape. McCollum brought Pool back upstairs and Pool's beating continued. They threatened Pool with a stun gun and may have used it on him. Eventually, Pool was brought downstairs and placed in a fruit cellar.

The next day, Pool's beating continued. McCollum, Ecklund, Isaak Engstrom, Toby Johnson, and Salem Bernhardt's brother, Scott, beat Pool. That night, Pool was returned to the fruit cellar and secured to a chair with duct tape.

The following night, July 20, 1999, Pool was taken from the fruit cellar and brought upstairs. Engstrom, Ecklund, and McCollum gave somewhat conflicting descriptions of the events that followed, culminating in Pool's death.

Engstrom testified that McCollum told Pool to get into a duffel bag. After Pool climbed into it, Engstrom zipped it shut. McCollum hit Pool's head with a closet rod, dragged the bag downstairs, and beat Pool's head with a hammer. Ecklund sprayed aerosol into the bag. McCollum stepped on the bag for at least ten minutes.

Ecklund testified that McCollum put Pool into the duffel bag. McCollum hit Pool's head with a hammer, dragged the bag downstairs, sprayed aerosol into the bag, and stood on Pool's chest or neck for several minutes.

McCollum did not testify at trial, but a recording of an interview police conducted with him on August 5, 1999, was introduced into evidence. McCollum told the police in that interview that someone put Pool in the duffel bag and someone

---

1. Before Pool told the police about Bernhardt, the police may have known that Bernhardt was inside Pool's house. Sometime prior to his arrest, Bernhardt called Mattson. Bernhardt said that he was at Pool's house and that police officers were outside, and asked whether Mattson knew why they were there. Mattson knew that there was an outstanding warrant for Bernhardt's arrest. After Bernhardt's call, Mattson informed the Hutchinson Police Department that Bernhardt was at Pool's house.

dragged the bag downstairs. McCollum denied beating Pool's head with a hammer and stated that Engstrom hit Pool's head with the hammer. McCollum and others sprayed aerosol into the bag. McCollum, Engstrom, and Johnson stood on Pool's stomach, chest, and neck.

After hitting Pool's head, spraying aerosol into the bag, and standing on Pool, Ecklund, McCollum, and Engstrom concluded that Pool had died. Ecklund and Engstrom described disposing of Pool's body as follows. Engstrom and McCollum placed the bag that contained Pool's body into the trunk of a car. Ecklund, Engstrom, and McCollum drove to a train trestle in Wright County. McCollum and Engstrom carried the bag halfway across the trestle. Engstrom retrieved a cinder block from the car and McCollum tied the block to the bag. They threw the bag off the trestle into the water below.

In his statement to the police, McCollum described disposing of the body as follows. McCollum, Engstrom, Ecklund, and Johnson drove to a train trestle. McCollum stayed at the car with Ecklund while Engstrom and Johnson carried the bag to the trestle. Either Johnson or Engstrom retrieved a brick from the car and returned to the trestle. They tied the brick to the bag and threw the bag off the trestle.

On July 28, 1999, officers from the Wright County Sheriff's Department discovered Pool's body in the backwater of the Clearwater River. Pool's body was identified on August 3, 1999. Police arrested McCollum two days later. Officers interviewed him that afternoon.

On September 22, 1999, a McLeod County grand jury issued a three-count indictment against McCollum: (1) murder in the first degree while committing kidnapping, in violation of Minn.Stat. § 609.185(3); (2) murder in the second degree, in violation of Minn.Stat. § 609.19, subd. 1(1); and (3) kidnapping, in violation of Minn.Stat. § 609.25, subd. 1(3).

McCollum's jury trial [2] took place from March 21 to 29, 2000. The state and McCollum each received a copy of the proposed final jury instructions and had an opportunity to review them. Before instructing the jury, the trial court asked the parties: "[I]s it correct that there have been no requested jury instructions which I have not included in this set of instructions?" Defense counsel responded: "Your Honor, that is correct. And I'm satisfied with the instructions as they are presented to me." The state agreed that the instructions did not omit any requested instructions. The trial court then instructed the jury. An instruction that the jury may not attach an adverse inference to McCollum's decision not to testify was not given to the jury. After instructing the jury, the trial court asked the parties whether the instructions as given contained any errors or omissions. They responded that the instructions as given did not contain any errors or omissions. The jury found McCollum guilty of all charged offenses.

At the sentencing hearing, the court entered a conviction for first-degree murder while committing kidnapping. The court denied McCollum's motion to sentence him without regard to the heinous crimes statute, Minn.Stat. § 609.106, subd. 2(2), and sentenced him to life imprisonment without possibility of release.

McCollum's petition for postconviction relief sets forth two claims: (1) that his

---

**2.** The trial court granted McCollum's motion for a change of venue and the trial was held in Dakota County.

conviction should be reversed and he be granted a new trial because the trial court did not inform him of his right to instruct the jury that it may not attach an adverse inference to the fact that he did not testify at trial; and (2) that his sentence should be modified to include the possibility of release because the indictment did not refer to the heinous crimes statute, Minn. Stat. § 609.106, subd. 2(2).

The postconviction court affirmed McCollum's conviction and sentence and denied his petition for postconviction relief. With respect to the jury instruction, the court concluded that the instruction should not be given without the defendant's request, that it was not error to exclude the instruction in the absence of McCollum's request for it, and that even if it was error to exclude the instruction without McCollum's waiver, any such error was harmless. With respect to the sentence, the court concluded that the indictment was legally sufficient and that a sentence of life imprisonment without possibility of release is statutorily mandated upon conviction of first-degree murder while committing kidnapping.

## I.

McCollum argues that his conviction should be reversed and that he is entitled to a new trial because the trial court did not inform him of the right to have the jury instructed that it could not attach an adverse inference to his decision not to testify. He asks us to create a new rule of law requiring such an instruction in all cases where a criminal defendant does not testify unless the defendant makes an express on-the-record waiver of the instruction. We decline to impose that requirement.

■ When requested by a criminal defendant who did not testify at trial, a state trial judge must give a no-adverse-infer-ence instruction to the jury. *Carter v. Kentucky*, 450 U.S. 288, 305, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). In Minnesota, the standard no-adverse-inference instruction is: "The defendant has the right not to testify. This right is guaranteed by the federal and state constitutions. You should not draw any adverse inference from the fact that the defendant has not testified in this case." 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 3.17 (4th ed.1999).

■ A trial court ordinarily should not give a no-adverse-inference instruction unless the defense requests it and, then, the better practice is for the trial court to inquire of the defendant himself whether he wishes to have such an instruction. *State v. Thompson,* 430 N.W.2d 151, 153 & n. 3 (Minn.1988); *see* Minn.Stat. § 611.11 (2000) ("[F]ailure to testify shall not create any presumption against the defendant, nor shall it be alluded to * * * by the court."). In limited circumstances, a trial court may be justified in giving the instruction in the absence of the defendant's request, and even over the defendant's objection. *See State v. Larson,* 358 N.W.2d 668, 671 (Minn.1984) (stating that trial court was justified in giving a no-adverse-inference instruction because defense counsel's closing argument opened the door to it); *State v. Grey,* 256 N.W.2d 74, 78 (Minn.1977) (dictum) (stating that trial courts should not comment on a defendant's decision not to testify unless the absence of a precautionary instruction would result in a manifest injustice); *cf. Lakeside v. Oregon,* 435 U.S. 333, 340–41, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978) (giving a no-adverse-inference instruction over a defendant's objection does not violate the defendant's privilege against compulsory self-incrimination).

A defendant who does not testify at trial has a right not to have anyone in the courtroom use his silence against him. Minn.Stat. § 611.11; *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *State v. Whittaker,* 568 N.W.2d 440, 451 (Minn.1997). By its terms, a no-adverse-inference instruction calls the defendant's silence to the jury's attention, and that ordinarily should not be done without the defendant's personal consent. Thus, if defense counsel requests such an instruction, the trial court or defense counsel should make a record of the defendant's clear consent and insistence that the instruction be given. *Thompson,* 430 N.W.2d at 153 & n. 3. If, on the other hand, defense counsel does not request the instruction, neither the trial court nor defense counsel has to make a record of the defendant's preference regarding the instruction. The decision not to request an instruction is a matter of trial strategy. *See State v. Doppler,* 590 N.W.2d 627, 635 (Minn.1999); *State v. Eling,* 355 N.W.2d 286, 293 (Minn.1984). "Strategic and tactical decisions should be made by defense counsel after consultation with the client where feasible and appropriate." *ABA Standards for Criminal Justice: Prosecution Function and Defense Function* Standard 4–5.2(b) (1993).

The rules of criminal procedure prescribe the process to determine jury instructions. Any party may file written requests for jury instructions at the close of evidence or during the trial as the court reasonably directs. Minn. R.Crim. P. 26.03, subd. 18(1). The court shall inform counsel of its proposed action regarding the requests before the arguments to the jury. *Id.* The court may, and upon the request of any party shall, inform counsel what instructions will be given before the arguments to the jury. *Id.,* subd. 18(2). Parties shall have an opportunity to object to the proposed instructions out of the hearing of the jury, or, if requested, out of the jury's presence. *Id.,* subd. 18(3). Unless a party objects before the jury retires to consider its verdict, the party cannot assign as error any portion of, or omission from, the jury instructions. *Id.*

Here, the parties each received a copy of the proposed final jury instructions and had an opportunity to review them. Before the trial court instructed the jury, the parties agreed that the final jury instructions did not omit any requested instructions. The instructions did not include CRIMJIG 3.17 or its equivalent. After the trial court instructed the jury, the parties agreed that the instructions as given did not contain any errors or omissions. In *Thompson,* we stated that, upon request for a no-adverse-inference instruction, a record should be made of the defendant's clear consent and insistence that the instruction be given. 430 N.W.2d at 153 & n. 3. It does not follow that a record of the defendant's preference must be made when no such request is made. In the absence of a request for the instruction, the trial court did not err by not giving it. We affirm McCollum's conviction.

## II.

McCollum argues that his sentence must be modified to include the possibility of release because the indictment did not refer to the heinous crimes statute, Minn. Stat. § 609.106, subd. 2(2). He asserts that the right to due process requires that an indictment refer to the statute that will govern a defendant's sentence if convicted. We disagree.

McCollum does not specify whether his due process claim arises under the United States Constitution, the Minnesota Constitution, or both. Both constitutions guarantee a criminal defendant the right to due process. U.S. Const. amend.

XIV, § 1; Minn. Const. art. I, § 7. "The due process protection provided under the Minnesota Constitution is identical to the due process guaranteed under the Constitution of the United States." *Sartori v. Harnischfeger Corp.*, 432 N.W.2d 448, 453 (Minn.1988). Under the due process clauses, "[a] criminal defendant has the right to be treated with fundamental fairness and 'afforded a meaningful opportunity to present a complete defense.'" *State v. Wolf*, 605 N.W.2d 381, 384 (Minn.2000) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)); *State v. Richards*, 495 N.W.2d 187, 191 (Minn.1992) (same).

■ McCollum acknowledges that the indictment advised him of the charges against him, and does not claim that the indictment denied him a meaningful opportunity to present a complete defense. Instead, McCollum claims that an indictment must contain a citation to the sentencing statute. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive *fair notice* not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (emphasis added); *see State v. Davidson*, 481 N.W.2d 51, 56 (Minn.1992) ("[D]ue process requires that criminal statutes be sufficiently clear and definite to warn a person of what conduct is punishable."); *State v. Simmons*, 258 N.W.2d 908, 910 (Minn.1977) ("[C]riminal statutes must be sufficiently clear and definite to inform a person of ordinary intelligence what conduct is punishable and how severe the punishment might be."). We have never held that fair notice of the penalty for criminal conduct requires that an indictment must reference the sentenc-

ing statute, but McCollum urges us to do that now.

McCollum acknowledges that the indictment advised him of the charges he faced, among them first-degree murder while committing kidnapping. A sentence of life imprisonment without possibility of release is mandatory upon conviction of that crime. Minn.Stat. § 609.106, subd. 2(2). Because the indictment informed McCollum of the charges against him, he had fair notice that he faced a sentence of life imprisonment without possibility of release if convicted of first-degree murder while committing kidnapping.

McCollum does not specify how the indictment's lack of a citation to the heinous crimes statute might have affected him such that it denied him the right to be treated with fundamental fairness. Similarly, we are unable to discern how the addition of the heinous crimes statute to the indictment could have affected him.

■ To be sure, "[t]o support a conviction, an indictment 'must fairly apprise the defendant of the charge brought against him, * * * [so] that he might properly prepare his defense, and so that he is protected from subsequent prosecution for the same offense.'" *State v. Mullen*, 577 N.W.2d 505, 510 n. 6 (Minn.1998) (quoting *State v. Wurdemann*, 265 Minn. 92, 94, 120 N.W.2d 317, 318 (1963)). Neither statute nor rule requires an indictment to refer to the statute that will govern a defendant's sentence if convicted. *See* Minn.Stat. § 628.18 (2000); Minn. R.Crim. P. 17.02. In any event, the sentence was readily ascertainable from the indictment. Minnesota Statutes § 609.106, subd. 2(2), provides that the court shall sentence a person to life imprisonment without possibility of release upon conviction of first-degree murder while committing kidnapping under section 609.185(3), which was charged in the indictment. McCollum's right to

due process under the United States and Minnesota constitutions was not violated. We affirm McCollum's sentence.

Affirmed.