STATE of Minnesota, petitioner, Appellant,

v.

Tom Dean HINCE, Respondent.

No. C9–94–699.

Supreme Court of Minnesota.

Dec. 15, 1995.

Hubert H. Humphrey III, Minnesota Atty. Gen., Catherine M. Keane, Asst. Atty. Gen., St. Paul, Joel R. Welder, Faribault County Atty., Blue Earth, for appellant.

John M. Stuart, Minnesota Public Defender, Marie L. Wolf, Asst. Public Defender, Minneapolis, for respondent.

## OPINION

STRINGER, Justice.

On February 12, 1993 the respondent, 21–year–old Tom Dean Hince, was charged with gross misdemeanor theft and gross misdemeanor receipt of stolen property relating to the theft of a handgun, in violation of Minn. Stat. §§ 609.52 subd. 2(1), 609.53 (1994). At an omnibus hearing held on April 26 and July 12 respondent challenged the admission in evidence of a confession he made to his father, the Chief of Police of Lake Crystal, on the bases that he had no *Miranda* warning and that the confession was not voluntary. The trial court ruled that the confession was voluntary and not coerced. The court of appeals reversed, concluding that the confession was coerced, and therefore did not rule on the *Miranda* issue. We agree with the trial court that the confession was voluntary

and that no *Miranda* warning was necessary; we therefore reverse the court of appeals.

On January 23, 1993 Scott Johnson reported to Deputy Sheriff Robert Perryman of the Faribault County Sheriff's Office that a pistol he kept in his home had been stolen. Johnson told Perryman that he believed the respondent had the gun. Perryman called Deputy Sheriff Will Purvis of Blue Earth County, where respondent resides, reportedly to avoid "stepping on the toes" of the Blue Earth County Sheriff's Department. Perryman asked Purvis if he would speak to respondent about the missing gun. Purvis instead called respondent's father, Lake Crystal Police Chief Robert Hince, to inform him as "one father to another father" that his son was suspected in the theft. Purvis testified at the omnibus hearing:

> my main concern was that the gun be recovered. I didn't want the son—I didn't want his son getting in trouble with the gun. I remembered telling him . . . that if my son was in that type of shape, that I would expect a call or something to that effect.

Purvis further testified that he made no promises regarding leniency, and that there was no discussion at all about a deal relating to prosecution for the theft. He simply asked Chief Hince to talk to the respondent and contact Deputy Perryman.

In his omnibus testimony Robert Hince confirmed that Will Purvis called him at work, saying that he wanted to talk to him "as a concerned father to concerned father." He also confirmed that he and Purvis did not discuss any kind of a plea or deal for respondent. Chief Hince testified that his impression from the telephone conversation was that "the main concern was to retain the firearm and get it back to the original owner. That I was doing this in the capacity as a father." Chief Hince could not reach the respondent immediately, but when he came home at the end of his shift he confronted him right away. He testified that when he arrived home he was "pretty shook up and pretty upset and mad, and when I [saw] him, 'Tom,' I said 'come with me right now' and he came with me." He did not want his ill wife to overhear the conversation, so he intended to bring respondent to his office where they could speak privately. Although he was still in uniform, Chief Hince testified that he believed his son was not responding to him as a police officer, but "as a father, because when I am upset with him I just basically kind of order him, 'come with me,' and he just come[s]."

The two Hinces drove in the Chief's pickup truck to the police station. Once in his office, the Chief did not read the respondent a *Miranda* warning "because I was talking to him as a father." Respondent initially denied any involvement with the handgun. The Chief testified that he then admonished him that "this person's revolver or gun was given to him by his folks, and it's a memento, and if you took it, I want it back now or out the house you're going." Between 5 and 10 minutes later, the respondent admitted that he had stolen the gun. He then made some phone calls, and the next morning the gun was placed in the Chief's truck. He and his father brought the gun to Deputy Perryman's office that evening. Chief Hince did not file a report, and he testified that if he had known that his son was an actual suspect and the Lake Crystal police were asked to investigate, he would have turned the matter over to another officer.

The respondent testified at the omnibus hearing that "the impression I got when he questioned me is if I returned the gun, that there would be no charges pressed against me, so I admitted I took it and we returned the gun that evening." He was then asked the following questions:

Q. How was it that you then decided to admit your involvement in this theft?

A. Well, I'm not really sure.

Q. Well, admit to your father, at least, that you did this? Was it because of the—did you get an impression in your mind that you would be charged?

A. I did at first, yes, and he told me basically they just wanted the handgun back. That's the impression I got, so I admitted to it. . . .

Later, respondent answered similar questions:

Q. Now, your father did say to you that they wanted to get the gun back?

A. Yes, he did.

Q. And you say that that gave you the impression that if you did return the gun, you would not be charged?

A. No. I didn't—I don't know. I don't know. Just the way he was talking to me I got the impression that I wouldn't be charged with this.

At the conclusion of the omnibus hearing, the district court denied the respondent's motion to suppress his statements to his father, finding that "[n]o *Miranda* [w]arning was required, and the defendant's constitutional rights against self-incrimination were not violated." On November 1, 1993, in a plea agreement pursuant to *State v. Lothenbach*, 296 N.W.2d 854, 857 (Minn.1980), the state dismissed the theft charge, and the parties submitted the charge of receiving stolen property to the court. Based on the facts presented at the omnibus hearing, the court found respondent guilty of receiving stolen property and sentenced him to one year in jail. The respondent appealed to the court of appeals the trial court's refusal to suppress his confession. In a split decision the court of appeals held that the confession was involuntary and reversed.

The court of appeals based its decision on the coercive environment Chief Hince created by wearing his uniform, demanding that his son come with him to the station, interrogating him angrily, and threatening to kick him out of the home. The court also deduced that Chief Hince coerced the respondent to confess by making implied promises of leniency. According to the court of appeals, "[t]he facts suggest ... Chief Hince overrode [respondent's] will, and authoritarian coercion prompted [him] to confess." This court granted the state's petition for further review to determine whether the defendant should have been given a *Miranda* warning and whether his confession was coerced.

▮ The first question presented on appeal is whether the respondent should have been given a *Miranda* warning before he made his confession. We review the trial court's findings of facts for clear error and

make an independent determination as to the *Miranda* issue. *See, e.g., State v. Hardimon*, 310 N.W.2d 564, 567 (Minn.1981). The trial court, however, made no findings of fact in this case; in its order following the omnibus hearing, the court simply concluded that "[n]o *Miranda* [w]arning was required, and the defendant's constitutional rights against self-incrimination were not violated." The facts are essentially undisputed, however.

▮ A *Miranda* warning is required when a police officer conducts a custodial interrogation of a suspect. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). In determining whether the circumstances render the suspect "in custody" necessitating a *Miranda* warning, the analysis begins with whether the suspect's freedom of action was restrained. *See Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612; *State v. Rosse*, 478 N.W.2d 482, 484 (Minn.1991). If the police did not make an arrest, then the court must look to all of the surrounding circumstances to determine whether the restraints on the defendant's freedom were comparable to those associated with a formal arrest. *Rosse*, 478 N.W.2d at 484 (citing *Berkemer v. McCarty*, 468 U.S. 420, 441, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984); *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)); *see also State v. Herem*, 384 N.W.2d 880, 883 (Minn.1986).

▮ The test for whether the defendant is in custody is an objective one: it is whether a reasonable person in the detainee's situation would have understood that he was in custody. *State v. Ronnebaum*, 449 N.W.2d 722, 724 (Minn.1990) (citing *Berkemer*, 468 U.S. at 422, 104 S.Ct. at 3141). Although Chief Hince testified that when he confronted his son he was "pretty shook up and pretty upset and mad," and that he commanded that he come with him to the police station, he did not force him to come, nor did the respondent's testimony indicate that he felt compelled to go, or even that he accompanied his father reluctantly. "[A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of

movement, the questioning took place in a 'coercive environment'" *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam).

The circumstances surrounding the questioning here were not threatening. The respondent apparently was free to go anytime, and the questioning lasted only about 15 minutes. Chief Hince did not inform respondent that he was not under arrest, but that alone is insufficient to create legal custody under *Miranda,* where the totality of the circumstances govern. *See State v. VanWagner,* 504 N.W.2d 746, 749 (Minn.1993). Certainly the defendant must have been accustomed to seeing his father in uniform, so that the mere presence of the police uniform did not present such a threat as to force him to go to the police station or answer his father. The two Hinces traveled to the station together in the father's pickup, obviously without restraint as to respondent. No other police officers were present during the brief questioning. Respondent then voluntarily made phone calls that led to the recovery of the gun. The police officer's command to the respondent that "if you took it, I want it back now or out the house you're going" is simply not enough to render him in police custody.

■■■ The second issue presented is whether the respondent's statements to his father were coerced. The respondent argues that the confession he made to his father was coerced by promises of leniency. For a confession to be deemed involuntary, there must be some element of coercive police conduct. *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986). Coercive conduct may consist of promises, express or implied, that elicit a confession. *See, e.g., Bram v. United States,* 168 U.S. 532, 565, 18 S.Ct. 183, 195, 42 L.Ed. 568 (1897); *State v. Thaggard,* 527 N.W.2d 804, 810–11 (Minn.1995); *State v. Biron,* 266 Minn. 272, 282, 123 N.W.2d 392, 399 (1963). The courts must look to the totality of the circumstances to decide voluntariness, including the age, maturity, intelligence, education, and experience of the accused; the ability to comprehend; the adequacy or lack of a warning; length and legality of the detention; nature of the interrogation; and whether the

accused was denied access to friends and family, or deprived of physical needs. *Thaggard,* 527 N.W.2d at 808; *see also State v. Jungbauer,* 348 N.W.2d 344, 346–47 (Minn. 1984). We are also guided by the principle that the fact that a promise was made in the process of obtaining a confession does not necessarily, in and of itself, render the confession involuntary. *Thaggard,* 527 N.W.2d at 811.

■■■ Respondent contends that his confession to his father should have been suppressed because he made it under the belief that he would enjoy freedom from prosecution. In his testimony, however, he was unable to point to any words or conduct on the part of his father that led him to believe that he would not be charged, nor did he even know why he believed he would not be charged. The most direct statement he made on this point was equivocal, at best: "[j]ust the way he was talking to me I got the impression that I wouldn't be charged with this."

In *State v. Orscanin,* 283 N.W.2d 897 (Minn.), *cert. denied,* 444 U.S. 970, 100 S.Ct. 464, 62 L.Ed.2d 385 (1979), the defendant's testimony was similarly vague as to how he formed the impression that he was being promised leniency. This court observed that:

[d]efendant's testimony * * * is replete with qualifying phrases such as "from what I gathered" or "as what I took it." * * * For a defendant to persuade a court that his confession was induced by a promise of leniency, he must make a stronger showing of specific inducements than defendant has made here.

*Id.* at 900.

The testimony indicates that Chief Hince did tell respondent that the police wanted to get the gun back. He did not, however, say anything to him about whether he would file a police report about the theft, and none of the testimony contains any reference to statements by Chief Hince about leniency. While respondent argues that the promise of leniency was implicit in Chief Hince's statement that the police wanted the gun returned, as *Orscanin* makes clear, an accused must make a stronger showing of an implied

promise to defeat the voluntariness of a confession. *See also State v. Slowinski*, 450 N.W.2d 107, 112 (Minn.1990) (although police made improper statements to the suspect, suggesting that they had influence with the county attorney, the statements were not promises and were not the sort that would prompt an innocent man to confess); *State v. Merrill*, 274 N.W.2d 99, 107 (Minn.1978) (even though defendant may have concluded from what the police said regarding degrees of homicide that he would be charged with manslaughter rather than murder, they did not say that he would be so charged).

The Chief's discussion with respondent was characterized by both parties as a father-to-son conversation. Respondent was 21 years old at the time he made the confession, and appears to have clearly comprehended the situation. This was not his first experience in the criminal justice system. Weighing the totality of the circumstances, we conclude that the confession was voluntary and not coerced.

Reversed.

PAGE, J., took no part.