STATE of Minnesota, Respondent,

v.

Peter James SHOEN, Appellant.

No. C1–97–324.

Supreme Court of Minnesota.

May 7, 1998.

John M. Stuart, Minnesota State Public Defender, Ann McCaughan, Assistant State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Attorney General, Margaret H. Chutich, Deputy Attorney General, Daniel A. Birkholz, Watonwan County Attorney, for respondent.

## OPINION

ANDERSON, Justice.

This case embodies one of the most basic tensions in the criminal justice system—the conflict between a criminal defendant's fundamental right to a fair trial and society's need for justice after a heinous crime has been committed. On March 1, 1996, appellant Peter James Shoen killed his wife, Kimberly Shoen, by beating her over the head with a metal pipe and strangling her. Beginning with jury selection and throughout the trial, the district court ordered Shoen to wear a leg restraint underneath his pants as a security device. The restraint made Shoen limp and may have been visible at the bottom of his pants leg. On the witness stand, Shoen admitted killing his wife, but claimed the killing was not premeditated. The jury found Shoen guilty of premeditated first-degree murder, and the court sentenced him to life imprisonment. On appeal, Shoen contends that he was denied his constitutional right to a fair trial because he was forced to wear the leg restraint. Shoen also raises six additional claims in a pro se brief.

The district court erred when it failed to state on the record the reasons for requiring Shoen to wear a leg restraint. Further, if the jury knew that Shoen was restrained during his trial and this awareness had an impact on the jury's decision, this would raise a serious question as to whether Shoen received a fair trial. We cannot tell from the record whether the jury was aware that Shoen was restrained, much less whether there was any prejudicial effect. We therefore remand his case to the district court for a *Schwartz* hearing to determine whether the jury was aware of Shoen's restraint and, if so, for the district court to determine whether that awareness deprived Shoen of his right to a fair trial.

Peter and Kimberly Shoen were married for nine years and had two children, a nine-year-old daughter and a six-year-old son. Along with Peter Shoen's parents, the couple owned and operated a 120–head, more than 500–acre dairy farm in rural Watonwan County that had been in the Shoen family for five generations. The Shoens had a troubled marriage. Two years before Kimberly Shoen's death, Peter Shoen had an affair with his cousin's wife, Dawn Shoen. After the affair ended, Peter Shoen remained friends with Dawn Shoen, talking to her on the phone almost daily. This continuing relationship with Dawn Shoen caused considerable tension in his marriage.

It is undisputed that Peter Shoen killed Kimberly Shoen on March 1, 1996. The police learned of Kimberly Shoen's death when Peter Shoen called 911 at around 2:00 that afternoon to report that his wife had fallen down the stairs. When paramedics arrived at the farm, they found Peter Shoen sitting in the kitchen at the foot of the stairs next to his wife's body. The first paramedic to arrive at the farm testified that she saw "a major amount of blood, more than I had been expecting." Local police typically responded to all emergency calls, and several officers arrived at the farm soon after the paramedics.

Because local police believed from the outset that Kimberly Shoen's death was suspicious, they asked the Bureau of Criminal Apprehension to assist in their investigation.

A BCA officer, accompanied by a Watonwan County deputy, interviewed Peter Shoen twice. The first interview occurred the afternoon of the murder, at about 4:30. The interview took place in the BCA officer's squad car and lasted for about an hour. The officers did not read Shoen his *Miranda* rights and told Shoen at the outset, "you're not in custody." Shoen told the officers that when he came back in the house at about 2:00 p.m., he found his wife lying there, "blood all over." He denied that he had harmed his wife. That evening, a search warrant was executed, and deputies searched the house and farmstead all night.

Early the following morning, March 2, a sheriff's deputy found a length of metal pipe with blood on it in a grove of trees near a machine shed. Following discovery of the bloody pipe, the BCA officer and the Watonwan County deputy questioned Shoen a second time for about 30 minutes. Before beginning this interrogation, the officers gave Shoen a *Miranda* warning, and he agreed to answer their questions.

Shoen then told the officers that he had killed his wife. He stated that Kimberly Shoen had found a receipt from the local feed store bearing Dawn Shoen's name. The day of the murder, the couple argued about Peter Shoen's relationship with Dawn Shoen. Kimberly Shoen threatened to leave Shoen, take their two children and the farm, and leave him with nothing. Shoen stated that he and his wife were standing at the top of the stairs as they argued, and that while they argued she shoved him. He admitted that he shoved her back, and she fell down the stairs. Shoen stated that when he saw his wife lying at the bottom of the stairs, he thought for a little while and then went outside into the yard to get a metal pipe. He claimed that he then hit her in the back of the neck. He said that it was "[j]ust like taking care of a cow, putting it out of [its] misery," and he acknowledged that he "had a pretty good idea" that hitting her with the pipe would kill her. He then went back outside to feed the cows. After he realized what he had done, Shoen came back inside the house and called 911. At the end of the interrogation, one of the officers asked Shoen whether he had made the statement of his own free will, and Shoen indicated that he

had. The officer also asked whether any promises or threats had induced Shoen to make a statement, and Shoen answered "no."

Shoen was arrested that day for the murder of his wife. Several weeks later, the grand jury indicted him for first-degree premeditated murder, and the indictment was later amended to include a charge of intentional second-degree murder. At the *Rasmussen* hearing, the defense moved to suppress both of Shoen's statements to the police, contending that his statement on March 1 was obtained in violation of his *Miranda* rights and his statement on March 2 was involuntary. The district court concluded that Shoen was not in custody on March 1 and therefore was not entitled to a *Miranda* warning. The court also held that Shoen's March 2 statement was voluntary. Both statements were admitted at trial.

On November 5, 1996, jury selection for the trial began at the Watonwan County courthouse in St. James. Shoen was brought into the courthouse wearing a leg restraint underneath his pants as a security device. The defense made a motion to remove the restraint, arguing that Shoen had been a model prisoner and that the sheriff had stated that Shoen was not a flight risk. The state countered that anyone charged with first-degree murder presented a flight risk and, further, that the jury would not be able to see the restraint because it was underneath Shoen's pants. The state also pointed out that the only courtroom guard available was a retired deputy because all of the active-duty deputies had participated in the murder investigation and thus were potential witnesses. The court ordered Shoen to wear the restraint, but only until an active-duty deputy was available to guard him. The defense moved for a mistrial and change of venue based on juror misconduct, and the court granted the motion, ordering that the trial be moved to New Ulm, the county seat of adjoining Brown County.

Jury selection began again on November 13 at the Brown County courthouse. Again Shoen appeared at the courthouse wearing the leg restraint, and again the defense made a motion for the restraint to be removed.

The defense argued that an active-duty deputy was currently available to guard Shoen in the new courthouse and that Shoen continued to present no flight risk. The state reiterated its contention that Shoen inherently presented a flight risk because he had been charged with first-degree murder, and, further, the restraint was innocuous and invisible to the jury. The state also contended that even if the jurors could see the restraint, they would not know it was a security device because very few people know this type of restraint exists. The court denied the defense motion without explanation. Shoen wore the restraint throughout the trial and contends that the restraint was apparent to the jury in four ways: he visibly limped, he had to reach down to unlock the restraint each time he wanted to bend his knee, the bottom of the restraint was visible below his pants leg cuff, and the jury could hear a chain rattling.

Testimony began on November 18. The BCA officer and the Watonwan County deputy testified about their questioning of Shoen, and the jury listened to the recordings of Shoen's two statements. The jury also heard graphic and detailed testimony about Kimberly Shoen's wounds. First, a BCA forensic scientist testified about the bloodspatter evidence. The scientist identified evidence of at least three separate blows with a blunt object. The first blow created the wound that drew blood to the surface; another occurred when Kimberly Shoen was kneeling; and another occurred when she was nearly at floor level. Next, the medical examiner who performed the autopsy testified that Kimberly Shoen had been struck with a blunt instrument at least six times and that at least one of her wounds was a defensive one, occurring as she attempted to block one of the blows. The medical examiner also stated that she had been alive while she was being strangled and that the force on her throat, whether from a hand or the pipe, was strong enough to fracture her hyoid bone. The medical examiner concluded that Kimberly Shoen died from asphyxiation and from traumatic injuries to her head and neck from blows by a blunt instrument.

Shoen testified for almost an entire day about his farming operation, his affair and ongoing relationship with Dawn Shoen, and the murder. His testimony about how the murder occurred corresponded to his second statement to the police. In addition, he described in some detail the hatred he felt toward his wife as he beat her with the metal pipe, and he testified that he kicked his wife in the back as she was lying on the floor and told her that he hated her. Shoen claimed, however, that he did not remember whether he hit his wife more than two or three times, nor did he remember strangling her. He explained that he initially decided to lie to the police about what happened so that he would be able to see his children one last time.

Shoen denied that he had ever physically abused his wife before the murder, and the state introduced no evidence to the contrary. The defense introduced testimony of ten character witnesses, all of whom testified that Shoen had a peaceful and nonviolent character. Shoen's father also testified on his behalf, and a psychological expert witness attempted to explain how Shoen could have killed his wife. The psychologist explained that a person can suffer an external psychological breakdown in which he becomes highly destructive and enraged in response to an overwhelming threat. Based on his interviews and testing of Shoen, the psychologist testified that Shoen was a highly emotionally controlled person who internalized tension and stress and thus had personality traits that could lead to experiencing an external psychological breakdown.

The trial concluded on November 22, and the jury was charged and instructed on first-degree premeditated murder, second-degree murder, and first-degree manslaughter. The jury instructions stated that one of the elements of first-degree murder is absence of heat of passion and defined heat of passion several times. That afternoon, the jury asked the court to clarify the meaning of heat of passion. The court referred the jury to the definitions of heat of passion contained in the jury instructions. That evening, the jury returned a verdict of guilty of first-degree premeditated murder. The court sentenced Shoen to life imprisonment.

On appeal, Shoen contends that he was deprived of his right to a fair trial because he

was forced to wear a leg restraint throughout the trial. In a supplemental pro se brief, he raises six additional claims: his statement to the police on March 1 was obtained in violation of his *Miranda* rights; his statement to the police on March 2 was involuntary; his attorney provided ineffective assistance of counsel; the prosecutor committed misconduct; the district court failed to correct the prosecutor's incorrect definition of first-degree manslaughter; and he was not tried by a jury of his peers.

### I.

 The United States Constitution and the Minnesota Constitution both guarantee a criminal defendant the right to a fair trial free from factors that undermine the presumption of innocence. U.S. Const. amends. VI, XIV; Minn. Const. art. I, §§ 6, 7; *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976); *State v. Coursolle*, 255 Minn. 384, 389, 97 N.W.2d 472, 476 (1959). Requiring a criminal defendant to appear in shackles or restraints is an inherently prejudicial practice that is constitutionally permissible only when "justified by an essential state interest specific to each trial." *Holbrook v. Flynn*, 475 U.S. 560, 568–69, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986). Curtailing a defendant's repeated disruption of his trial is the sort of essential state interest that justifies the use of physical restraints. *See, e.g., Williams*, 425 U.S. at 505, 96 S.Ct. at 1693; *see also State v. Jones*, 311 Minn. 176, 181–82, 247 N.W.2d 427, 430–31 (1976) (holding that defendant's threat to make a statement to the jury without first clearing it with the court and his refusal to promise to remain silent during trial justified district court's order to bind and gag defendant during trial). We have cautioned, however, that even though a court has discretion to require restraints when "necessary to prevent violence or escape," the defendant's conduct must create "some immediate necessity" for such restraints. *Coursolle*, 255 Minn. at 389, 97 N.W.2d at 476–77.

 Minnesota Rule of Criminal Procedure 26.03 creates additional parameters for the court's use of restraints and lists several procedural requirements that the district court must follow. The rule prohibits physical restraint of a defendant while in court

unless the court "has found such restraint reasonably necessary to maintain order or security." Minn. R.Crim. P. 26.03, subd. 2(c). When the court orders such restraints, it must state its reasons on the record outside the presence of the jury. *Id.* Failure to make findings on the record regarding the need for restraints is error. *State v. Lehman*, 511 N.W.2d 1, 3 (Minn.1994). Nevertheless, if a court fails to make such findings, we will examine the record to determine if the decision was objectively justified. *Id.*

 We interpreted Rule 26.03 in *State v. Stewart* and clarified that first, the use of the restraints must be eminently necessary, and second, the restraints must be reasonable and the least coercive under the circumstances. 276 N.W.2d 51, 61 (Minn.1979). The court need not wait for the defendant's conduct in the courtroom to actually disrupt the proceedings and instead may infer immediate necessity from the defendant's attributes or prior conduct. *Id.* at 62. The court should consider various factors in determining the necessity of restraints. These factors may include

> the seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destruction tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternate remedies.

*Id.* at 62 n. 5 (quoting *State v. Tolley*, 290 N.C. 349, 226 S.E.2d 353, 368 (1976)). After the court has made a record justifying its decision, the defendant must be given the opportunity to challenge the court's reasoning. *Id.* at 62. We will overturn a court's decision to order restraints only if the court abused its discretion. *See id.* at 63; *Jones*, 311 Minn. at 184, 247 N.W.2d at 432.

Previous cases describe several recurring circumstances that justify restraining a criminal defendant. We held in *Stewart* that the

district court did not abuse its discretion in ordering the defendant to have one hand shackled to his chair. 276 N.W.2d at 63. When ordering the defendant to be shackled, the court relied on psychiatrists' reports strongly suggesting that the defendant could be violent at trial due to his homicidal and suicidal tendencies. *Id.* at 62–63. Moreover, the defendant had written a letter to the prosecutor threatening to kill him. *Id.* at 56. Finally, the district court recognized that the defendant had been charged with a "very serious crime," first-degree murder, and that he had admitted committing the murder. *Id.* at 62. In *State v. Scott,* we noted that the defendant had earlier escaped from prison and that under *Stewart,* this factor would support the district court's decision to restrain the defendant. 323 N.W.2d 790, 792 n. 2 (Minn.1982). Likewise, in *State v. Eling* we affirmed a court's decision to bring the defendant from the jail to the courtroom in handcuffs.[1] 355 N.W.2d 286, 292 (Minn. 1984). In *Eling,* the district court based its decision on the following factors: the defendant was charged with first-degree murder; he had seven prior felonies; two accomplices were still at large; there had been documented threats to witnesses; and witnesses feared the defendant and his friends. *Id.*

In our most recent consideration of the validity of restraining a defendant, we affirmed a district court's decision to require a defendant to wear a leg restraint beneath his pants. *Lehman,* 511 N.W.2d at 3. In *Lehman,* we held that the court erred in failing to make findings on the record regarding the need for the restraint. *Id.* at 1. Nonetheless, we reviewed the record and concluded that the court's decision was objectively justified. *Id.* at 3. The record showed that the defendant was a violent recidivist on trial for assault with a dangerous weapon, another violent offense; he had an earlier conviction for a violent escape from custody; and he was representing himself, which required him to be able to move around the courtroom. *Id.* We also held that the leg restraint in question was a very minimal restraint and still allowed the defendant to walk. *Id.* We note that the leg restraint in *Lehman* ap-

pears similar to the restraint Shoen was ordered to wear.

In Shoen's case, the district court twice denied the defense's motion to remove the restraint. During the first jury selection, in Watonwan County, the court did articulate several reasons for restraining Shoen. The court held that because all of the active-duty Watonwan County sheriff's deputies were potential witnesses and thus were not available to provide security, and because the only person available to guard Shoen was a retired deputy, Shoen had to wear the restraint until an active-duty deputy was available. The court added that once an active-duty deputy was available to provide security, Shoen would no longer have to wear the restraint. Because of the mistrial, however, the court's initial decision to restrain Shoen is not before us, and accordingly we render no opinion as to the propriety of the court's decision before the mistrial was declared.

█ When jury selection began again in Brown County, the court made no record of its reasons for ordering Shoen to be restrained. At that time, the defense again made a motion to remove the restraint. The defense argued that the conditions necessitating the restraint were no longer present: there was a full-time deputy to guard Shoen, and Shoen continued to present no flight risk. The state again argued that Shoen presented a risk because he was charged with first-degree murder, the restraint itself was innocuous, and the jurors were unlikely to interpret the leg restraint as a security device because few people know this type of restraint exists. The court denied Shoen's motion without explanation.

█ Under our decision in *Lehman,* the court's failure to make findings on the record regarding the need for restraints is error. *See* 511 N.W.2d at 1. Nonetheless, *Lehman* indicates that we must review the record to determine whether the court's decision was objectively justified. *Id.* In light of the noticeable lack of *Stewart* factors that would justify the decision to restrain Shoen, we conclude that the court's decision to restrain

---

1. The defendant in *Eling* was not restrained while in the courtroom, and we approved of the district court's reasonable efforts to minimize the defendant's exposure to the jury's view while he was in handcuffs. 355 N.W.2d at 292.

Shoen was not objectively justified. *See Stewart*, 276 N.W.2d at 62 n. 5. The Watonwan County Sheriff stated that Shoen was not a flight risk, and the defense argued that he was a model prisoner while in custody. There were no allegations that Shoen had made any escape attempts, nor was there any evidence that he had a plan to escape. The state did not allege that he had made any threats to harm others or himself. He had no accomplices. He admitted that he had killed his wife, but the record is conspicuously absent of any evidence that he had ever been violent before he killed his wife. Moreover, given that Shoen's family had farmed in the area for five generations, he had strong ties to the community that lessened the risk that he might flee. Shoen's past behavior contrasts markedly to the defendants in *Stewart, Scott,* and *Lehman,* all of whom had the potential to disrupt the courtroom proceedings. *See Stewart*, 276 N.W.2d at 63; *Scott*, 323 N.W.2d at 792 n. 2; *Lehman*, 511 N.W.2d at 3.

■ We are particularly concerned about the state's attempts to justify restraining Shoen: that Shoen presented a per se risk of flight because he had been charged with first-degree murder and that the leg restraint was the most innocuous type of restraint available. Certainly the seriousness of the charge against the defendant is one of the factors a court may consider in determining that restraints are necessary. *See Stewart*, 276 N.W.2d at 62 n. 5. Indeed, we have approved orders for restraints when the court has included the seriousness of the charge as part of its analysis. *See Lehman*, 511 N.W.2d at 3; *Eling*, 355 N.W.2d at 292; *Stewart*, 276 N.W.2d at 62. But in those cases, the seriousness of the charge was only one of many factors on which the court based its decision. Adopting a per se rule that all defendants charged with first-degree murder should wear restraints violates the constitutional requirement that an inherently prejudicial practice like shackling or restraining a criminal defendant is permitted only when justified by an "essential state interest specific to each trial." *Holbrook*, 475 U.S. at 568–69, 106 S.Ct. at 1346.

■ For the same reason, the harmlessness or innocuousness of the restraining device cannot justify restraining a defendant.

This rationale fails to take into account the particular circumstances specific to each case. If we were to permit restraints any time the device is purportedly harmless, we can envision a future in which essentially all criminal defendants will be shackled. The constitutional guarantee of a fair trial mandates that the district court thoroughly and explicitly consider whether restraints are reasonably necessary based on the individual defendant's circumstances and that the court refrain from ordering restraints unless no lesser security measures will suffice. *See Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970) ("[N]o person should be tried while shackled and gagged except as a last resort."); *Stewart*, 276 N.W.2d at 61 (stating that "shackling should be virtually a matter of last resort" and restraints must be the least coercive under the circumstances).

■ Even though the district court erred in ordering Shoen to wear the leg restraint, that error is not prejudicial absent evidence that the jury knew he was wearing the restraint. *See Scott*, 323 N.W.2d at 792. The record is silent as to whether the jurors were in fact aware that Shoen was wearing a restraint. But Shoen cites four ways that the restraint was apparent to the jury: Shoen visibly limped, he had to reach down to manually unlock the restraint whenever he wanted to bend his knee, the bottom of the restraint was visible below his pants leg cuff, and the jury could hear the chain rattling. In contrast, the state argues that some counsel and participants in the trial were not aware that Shoen was wearing the restraint. Moreover, the state contends that even if the jurors realized that Shoen walked with a limp, they would not understand that the limp was due to a restraint because very few people know that such a restraint exists.

Based on the record before us, we do not know whether any or all of the jurors realized that Shoen was forced to wear a restraint. Therefore, we cannot assess the prejudicial effect, if any, on the outcome of Shoen's trial. Thus, the issue is not yet amenable to harmless error analysis. Harmless error analysis inherently requires that we first consider the nature and extent of the

error before we go on to consider whether the conviction was "surely unattributable" to the error. *See Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); *State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997); *State v. Jones,* 556 N.W.2d 903, 910 (Minn.1996). If the jurors were unaware that Shoen was wearing the leg restraint, then obviously any error in requiring him to wear the restraint did not have an impact on the verdict.

Because we do not know the nature and extent of the district court's error, we remand the case to the district court for a *Schwartz* hearing. Although a *Schwartz* hearing was originally conceived as a vehicle for the district court to address questions of jury misconduct, its applicability has expanded to address other post-trial issues involving juries. *See, e.g., Bianchi v. Nordby,* 409 N.W.2d 835, 838 (Minn.1987) (stating that a *Schwartz* hearing is appropriate to correct possible clerical error in jury's verdict). In the context of restraints, we stated in *Lehman* that a defendant could be entitled to a *Schwartz* hearing at which the district court

> would ask the jurors not about their thought processes in concluding defendant was guilty (which is forbidden at a *Schwartz* hearing) but whether they noticed defendant was wearing a leg brace and, if so, whether they were aware it was a security device rather than a medical device. In an appropriate case where a hearing is warranted, the [district] court could hold the hearing notwithstanding the passage of a significant period of time following trial.

511 N.W.2d at 3–4 n. 1 (citations omitted). If the district court determines after a *Schwartz* hearing that the jury knew that Shoen was wearing a restraint, the district court is then in the position to apply the harmless error standard to determine whether Shoen's guilty verdict is "surely unattributable" to the restraints. *See Juarez,* 572 N.W.2d at 292.

We hasten to distinguish Shoen's case from *Lehman,* in which we declined to order a *Schwartz* hearing. *See* 511 N.W.2d at 3–4. In *Lehman,* the defendant represented himself and revealed to the jury that he had been required to wear a leg restraint as a security precaution. *Id.* at 2–3. In addition, the defendant presented evidence of his good character and was later impeached by his prior convictions for armed robbery and disarming and threatening to kill a deputy. *Id* at 1–2. We concluded in *Lehman* that even if the jury had realized that the defendant was wearing a security device, they likely would not have inferred that he was a dangerous person from the security device, but rather from the properly admitted impeachment evidence of his prior offenses. *Id.* at 4. In contrast, Shoen did not tell the jury that he was wearing a restraint, nor did the jurors consider prior offenses or other evidence from which they could infer that Shoen was a dangerous person. We therefore remand Shoen's case to the district court for a *Schwartz* hearing and other proceedings consistent with this opinion.

## II.

Shoen submitted a supplemental pro se brief in which he raises six additional claims: his statement to the police on March 1 was obtained in violation of his *Miranda* rights; his statement to the police on March 2 was involuntary; his trial counsel provided ineffective assistance of counsel; the prosecutor committed misconduct; the court failed to correct the prosecutor's incorrect definition of first-degree manslaughter; and he was not tried by a jury of his peers.

### A. Violation of *Miranda* Rights in Obtaining the March 1 Statement

Shoen first contends that his statement to the police on March 1, 1996 was obtained in violation of his *Miranda* rights. A defendant is not entitled to a *Miranda* warning unless he is in custody, and the determination of whether a suspect is in custody is an objective inquiry: whether a reasonable person in the suspect's situation would have understood that he was in custody. *State v. Hince,* 540 N.W.2d 820, 823 (Minn.1995). An appellate court reviews a district court's findings of fact for clear error. *Id.* It makes an independent review, however, of the district court's determination regarding custody and the necessity of a *Miranda* warning. *Id.* The district court found that Shoen was not in custody on March 1.

The court therefore concluded that Shoen was not entitled to a *Miranda* warning.

The officers interviewed Shoen after he had called 911 allegedly because his wife had been killed in a fall down a flight of stairs. A reasonable person whose wife had died in an accident would expect to talk with the police about what had happened. Moreover, the BCA agent told Shoen at the outset of the interview that he was not in custody and asked Shoen if he was willing to talk. Shoen told the BCA agent and the sheriff's deputy that he was willing to speak with them. Later in the interview, the BCA agent reiterated that Shoen was not under arrest. A reasonable person would not have believed that he was in custody in this situation. Because we conclude that Shoen was not in custody, we necessarily conclude that he was not entitled to a *Miranda* warning and that his statement on March 1 was properly admitted.

### B. Involuntary Nature of the March 2 Statement

■ Shoen next claims that his statement to police on March 2, 1996 was involuntary. A defendant's statement or confession is voluntary absent a showing of coercive police activity. *State v. Camacho*, 561 N.W.2d 160, 169 (Minn.1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). When reviewing a district court's conclusion, we must make an independent determination based on the totality of the circumstances as to whether a defendant's statement was voluntary. *Id.* at 170. The district court concluded that Shoen's statement on March 2 was voluntary.

Shoen was 34 years old at the time of the murder, had a high school education, and was a successful farmer. Before Shoen made his statement, one of the officers read him his rights, and Shoen agreed to speak with the two officers. Shoen also agreed that the officers had made no threats or promises to induce him to talk. After reviewing the transcript of the statement, we conclude that the officers did not coerce or attempt to coerce Shoen into giving the statement. His statement on March 2 was voluntary and was therefore properly admitted.

### C. Ineffective Assistance of Trial Counsel

Shoen also asserts that he received ineffective assistance of trial counsel because his counsel failed to call certain witnesses, including an expert to rebut the testimony of the medical examiner. Minnesota has adopted the United States Supreme Court's two-part test to determine whether a defendant received ineffective assistance of counsel: first, did counsel's representation fall below an objective standard of reasonableness; and second, would the result have been different but for counsel's deficient performance? *Gustafson v. State*, 477 N.W.2d 709, 712 (Minn.1991). Counsel's decision about which witnesses to call is a matter of trial strategy and thus is a matter within counsel's discretion. *State v. Bliss*, 457 N.W.2d 385, 392 (Minn.1990). Shoen's counsel called 14 witnesses, including a psychological expert. It is readily apparent from the record that counsel had some strategic reason in determining which experts or other witnesses to call. There is no indication that Shoen's counsel's performance fell below some objective standard of reasonableness, and thus we need not address the possibility that the result would have been different if counsel had called additional witnesses.

### D. Prosecutorial Misconduct

Shoen claims that the prosecutor committed misconduct during cross-examination and closing argument by referring to Shoen's affair with Dawn Shoen; raising paternity issues as to Dawn Shoen's oldest child; attempting to make Dawn Shoen appear responsible for Kimberly Shoen's death; and referring during closing argument to Shoen's "plan" to murder his wife. The defense did not object to any of these issues during trial. Shoen appears to have confused prosecutorial misconduct with the state's trial strategy. The state's theory of the case was that Shoen was motivated by his love for Dawn Shoen to kill his wife. The use of these themes was proper and relevant to Shoen's motive and premeditation.

### E. Heat of Passion

■ Shoen claims that the state confused the jury in discussing heat of passion as an

element of first-degree murder and that the district court erred in failing to correct the jury's confusion. The state has the burden to prove absence of heat of passion as an element of first-degree premeditated murder. *See State v. Auchampach*, 540 N.W.2d 808, 818 (Minn.1995). There is no evidence that the state misstated this requirement. More significantly, the jury instructions included absence of heat of passion as an element of first-degree murder. When the jury asked for clarification regarding the definition of heat of passion, the court referred the jury to four places in the jury instructions where heat of passion was defined. Indeed, the court instructed the jury that it should disregard any statement of law by an attorney that differed from that of the court. We presume that jurors follow the court's instructions. *See State v. Forcier*, 420 N.W.2d 884, 885 n. 1 (Minn.1988). We conclude that if any confusion lingered in the jurors' minds after closing arguments, the district court's instructions cured the problem.

F. Jury of Peers

Finally, Shoen claims that he was denied due process because he was tried by an "urban" jury in New Ulm that did not include any full-time farmers. It is well-settled that a defendant is not entitled to a jury of a particular composition. *State v. Ruud*, 259 N.W.2d 567, 580 (Minn.1977), *cert. denied*, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978). To prevail, Shoen would have to show that the process by which the jury was selected was defective. *State v. Holty*, 307 Minn. 478, 480, 238 N.W.2d 615, 617 (1976). Shoen has not presented any evidence that the jury-selection procedures were faulty, and he made no objection during jury selection.

None of the issues Shoen raises in his pro se brief demonstrate error by the police, counsel, or the district court. We conclude, however, that the district court did err in failing to make findings on the record regarding the reasons for ordering Shoen to be restrained throughout the trial. We also conclude that the record does not objectively justify the court's restraint of Shoen. Because we cannot determine whether the jurors were aware of Shoen's restraint, we remand his case to the district court for a *Schwartz* hearing.

Remanded for proceedings consistent with this opinion.

GILBERT, J., took no part in the consideration or decision of this matter.

PAGE, Justice (concurring in part, dissenting in part).

I agree with the court's conclusion that the trial court erred when it failed to make findings on the record supporting its decision requiring Shoen to wear leg restraints. I also agree with the court's conclusion that that decision was not objectively justified. But I do not agree with the court's remand to the trial court for a *Schwartz* hearing. My view of the record presented leads me to the conclusion that Shoen's conviction was "surely unattributable" to the trial court's error and was therefore harmless beyond a reasonable doubt.[1]

Shoen admitted to killing his wife. As a result, the only real issue for the jury to decide was whether Shoen was guilty of first-degree murder, second-degree murder, or first-degree manslaughter. When reviewing a conviction for harmless error, we look to the totality of circumstances leading to the conviction.[2] One factor we consider is the nature of the evidence presented at trial.

While not the only factor, it is an important one.[3] Here, the evidence of premeditation and intent necessary to convict Shoen of first-degree murder is direct, compelling, and overwhelming. While Shoen argues that wearing the restraint may have made it appear that he was not a peaceful man and needed to be restrained for the jurors' safety and that this could have made the difference

1. *State v. Juarez*, 572 N.W.2d 286, 292 (Minn. 1997).

2. *State v. Forcier*, 420 N.W.2d 884, 886–87 (Minn.1988).

3. *Juarez*, 572 N.W.2d at 292.

between a verdict of first-degree murder and one of first-degree manslaughter, that argument is strained at best. First, no less than 10 character witnesses testified on Shoen's behalf that he had a peaceful and nonviolent character. Thus, to the extent that the jurors may have been inclined to infer from the restraint that Shoen was not peaceful or that he was being restrained for their safety, that inference was counterbalanced. Second, and more important, the evidence in the record establishes beyond a reasonable doubt that Shoen was guilty of the crime for which he was convicted and that it is highly unlikely that the leg restraint played any role in that conviction. Beyond his admission that he killed his wife, the jury heard a tape of Shoen telling the police that killing his wife was "[j]ust like taking care of a cow, putting it out of their [sic] misery," and acknowledging that he "had a pretty good idea" that hitting her over the head would kill her. Shoen admitted on cross-examination that he thought about killing his wife and that he presumed she was still alive both before he went outside to find a pipe to bludgeon her with, as well as when he began hitting her with the pipe. The jury also heard testimony about his wife's injuries which demonstrated that Shoen hit her with the pipe at least six times, in addition to strangling her. Finally, the jury heard Shoen testify that, after killing his wife, he took the time to go out and feed his livestock before calling the police and that he initially lied to the police about killing her.

The totality of the circumstances leads to the inescapable conclusion that the trial court's error was harmless beyond a reasonable doubt and that no *Schwartz* hearing is required.

GARDEBRING, Justice (concurring in part, dissenting in part).

I join in the opinion of Justice PAGE.