**STATE of Minnesota, Respondent,**

v.

**Steven James ERICKSON, Appellant.**

**No. C1–98–1418.**

Supreme Court of Minnesota.

July 15, 1999.

John M. Stuart, Minnesota State Public Defender, Michael F. Cromett, Assistant

State Public Defender, Roseville, for appellant.

Michael A. Hatch, Atty. Gen., Robert A. Stanich, Asst. Atty. Gen., St. Paul, Patrick A. Oman, Mower County Atty., Austin, for respondent.

## OPINION

BLATZ, Chief Justice.

Appellant Steven James Erickson was convicted of first-degree murder, conspiracy to commit first-degree murder, and the theft of three handguns, and was sentenced to life imprisonment. On appeal, he contends that the trial court erred by allowing the jury to separate overnight during its deliberations. He also claims that the bailiff had improper contact with the jury, and that the trial court failed to hold an appropriate hearing to determine the extent of the improper contact. Finally, he argues that the trial court erred by ordering him to wear a leg restraint during the trial without making timely findings on the record justifying its order.

We conclude that the trial court made several serious errors over the course of this trial. It allowed the jury to separate during its deliberations; it conducted a preliminary hearing concerning improper contact between the bailiff and jury without appellant present; and it ordered appellant to wear a leg restraint at trial without making timely findings justifying its order. Although in the instant case none of these errors singularly constitutes error requiring a *Schwartz* hearing or outright reversal, their confluence causes us grave concern. In the interests of justice, we retain jurisdiction over this case but remand it for a *Schwartz* hearing to determine whether the jurors were subject to any outside influences during their overnight separation, the nature and scope of the bailiff's improper contact with the jury, and whether the jury realized that appel-

lant appeared in a leg restraint for security purposes.

This case arises from the shooting death of Michael Hjelman. At approximately 2:30 a.m. on July 15, 1997, someone knocked at the back door of Hjelman's house, awakening him and his girlfriend, Jessica Alvarez. Hjelman went to see who was there, and opened the door. Alvarez, waiting in bed, heard three or four gunshots, and someone say, "Shoot him. Just shoot him." Six or seven more gunshots followed. Alvarez hid in the bedroom closet for five or ten minutes, and then drove to the police station.

Police arrived at the scene at 2:39 a.m. and found Hjelman's body on the kitchen floor. He had been shot ten times from close range, causing 23 entrance and exit wounds. With the exception of two defensive wounds to Hjelman's hand and arm, all of the wounds were fatal in and of themselves. Hjelman died of exsanguination due to the multiple gunshot wounds.

Hjelman was a wholesale marijuana dealer. According to Alvarez, Hjelman believed that appellant might have stolen a quarter pound of his marijuana, worth between $350 and $400. Alvarez had witnessed an encounter between appellant and Hjelman over this dispute in which appellant attempted to shake hands with Hjelman but Hjelman brushed appellant aside.

During the days before Hjelman's death, appellant and his friend, James Iverson, were among several young people partying at a home near Austin. On July 11, the homeowner, Paul Langstaff, had gone on a weeklong vacation. His stepdaughter, Joi Larson, was instructed to stay with Langstaff's son in Mapleview. However, Larson returned to her home on July 12 with a group of friends to drink.

Larson told her drinking friends not to enter her father's gun room. Nevertheless, on July 12 or 13, appellant and Iverson jimmied the lock to the gun room and, using keys found in the house, opened the

gun safe. Appellant and Iverson stole three guns from the safe, a Ruger .44 magnum revolver, a nine millimeter Astra semiautomatic pistol, and a nine millimeter Tech nine semiautomatic pistol, and brought the guns to Iverson's house.

On July 14, Larson went into Austin and spoke with Luke Renaux. Renaux told Larson that there was a "$450 hit" on appellant over a drug deal. Larson returned home and told Iverson about the "hit." Iverson told Larson not to worry, but then pulled appellant aside to warn him. Appellant seemed shaken, and appellant and Iverson went back to town to talk to Renaux. Renaux told them that Hjelman had placed the "hit" on appellant because appellant had stolen drugs from Hjelman.

Later that afternoon, Iverson went to see his girlfriend, Nicholle Hansen, with appellant and appellant's friend, Peter Watkins. Iverson told Hansen that they were going to look for Hjelman. Appellant, Iverson, and Watkins returned to Iverson's house, where appellant and Iverson showed Watkins the guns they had stolen from Larson's house. Appellant asked Watkins where Hjelman lived, and the three decided to drive by Hjelman's house. When they drove past the house, no one appeared to be home so the three drove back to Larson's house.

While at Larson's, appellant and Iverson discussed what to do about Hjelman. Appellant wanted to talk to Hjelman "to get things settled," and so a few hours later appellant and Iverson left Larson's house in appellant's truck to confront Hjelman. The two returned to Larson's house two hours later, dressed in black. Both were quiet; appellant seemed preoccupied, and Iverson was talking to himself incoherently.

Appellant called his girlfriend, Lisa Burback, and told her that he had killed Hjelman. He later asked another woman at the party to give him a ride to Burback's house, saying he did not feel well enough to drive himself. When appellant got to Burback's house, he described killing Hjelman to her.

The next day, Iverson and Hansen went to Burback's house to talk with appellant. Appellant suggested selling the guns to an acquaintance of his, and both women wiped the guns down with alcohol. Appellant and Iverson took the guns to a farmhouse and left them in a cabinet for appellant's acquaintance, while Burback and Hansen cleaned appellant's truck.

Police arrested Iverson the next morning. He entered into a plea agreement, confessing to the killing and agreeing to cooperate fully. At trial, he related in detail how he and appellant murdered Hjelman. Iverson testified that after leaving Larson's house, he and appellant retrieved the three stolen guns from Iverson's house. They drove to Hjelman's house, and approached it from the back. Iverson braced the screen door open with his leg and knocked. As Hjelman opened the back door, Iverson stepped in and appellant began shooting Hjelman. At this point, Iverson claims he blacked out and does not remember shooting his gun. After the shooting, appellant and Iverson ran back to appellant's truck.

Appellant testified at trial that he was aware of Hjelman's "hit" on him, but that he was unconcerned about it. Still, he conceded that he realized that there would be a confrontation "[s]ooner or later." On the night of Hjelman's murder, appellant claimed to be so drunk that he had only a vague recollection of leaving the party with Iverson and no recollection of loading the guns, going to Hjelman's house, shooting Hjelman, or returning to the party.

The jury rejected appellant's claims of lack of premeditation and intoxication, finding appellant guilty of first-degree murder, conspiracy to commit first-degree murder, and theft of firearms. As the judge was about to enter the courtroom to receive the verdict, he overheard the bailiff telling a law clerk that the bailiff had spoken with the jury during its delibera-

tions. Without advising counsel of the bailiff's conduct, the judge took the verdict and sentenced appellant. He then called both counsel into chambers and informed them that the bailiff possibly had improper contact with the jury during the jury's deliberations. The court *sua sponte* conducted a preliminary inquiry two days later, questioning only the bailiff and the jury foreman. Appellant was not personally present at the hearing, but his counsel attended and questioned both witnesses.

At the hearing, the bailiff related that while the jury was deliberating, the foreman requested a large diagram of the back of Hjelman's house to answer a question about the rear of the house. The diagram requested by the jury was an exact blowup of an 8½" by 11" scale diagram of the back of Hjelman's house, with no extraneous information on it. The smaller diagram had been entered into evidence. The larger diagram, while referred to extensively by both sides at trial without objection, had not been entered into evidence. The jury foreman testified that he asked the bailiff for the large diagram because it was hard for 12 jurors to see the smaller diagram. The bailiff brought the diagram into the jury room between 9:00 and 9:30 p.m. without consulting the court. According to the foreman, when the bailiff arrived with the diagram, the jury's conversation had already shifted to another topic. The jury's conversation stopped when the bailiff entered, and there was no conversation between the bailiff and the other jurors. The jury deliberated until 10:00 p.m. before adjourning for the night.

Later, the bailiff relayed the jury's request for the large diagram to the court. The court advised the bailiff that the large diagram was not in evidence and should not be given to the jury, not knowing that the bailiff had already given it to the jury.

The next morning the bailiff went into the jury room before deliberations resumed to remove the large diagram. Only the foreman was present. The bailiff explained that he had to remove the diagram because it was not evidence. The foreman told the bailiff that the jury had not looked at the diagram the previous night. On his way out of the jury room, the bailiff stated, "Maybe you should review the video," which contained footage of the back of Hjelman's house. The bailiff made no further comments to the foreman and had no other conversations with the jury. When other jurors arrived, the foreman explained to them the reason that the large diagram was no longer in the jury room.

At the conclusion of the May 7 hearing, appellant moved for a *Schwartz* hearing to question all 12 jurors about possible improper contact with the bailiff. The trial court denied appellant's motion for a *Schwartz* hearing, ruling that a further hearing would be duplicative. The court subsequently issued a detailed order and memorandum ruling that neither having the large diagram in the jury room nor the bailiff's comment to the jury foreman about the video were prejudicial.

## I.

Appellant claims that the trial court erred by allowing the jury to separate during its deliberations without his consent. Minnesota Rule of Criminal Procedure 26.03, subd. 5(1), provides in relevant part:

> With the consent of the defendant the court, in its discretion, may allow the jurors to separate over night during deliberation. The officers shall not speak to or communicate with any juror concerning any subject connected with the trial nor permit any other person to do so, and shall return the jury to the courtroom at the next designated trial session.

 Under this rule, it is error for a trial court to allow the jury to separate during deliberations without the defendant's consent. *See State v. Sanders,* 376 N.W.2d 196, 204 (Minn.1985). Still, a new trial will be ordered only upon a showing of prejudice by the appellant. *Id.* at 206.

Prejudice will be presumed upon a showing by the defendant of private communications or contact or other circumstances suggesting direct or indirect improper influence or jury tampering, such as "pervasive, unfavorable publicity." *State v. Anderson,* 379 N.W.2d 70, 81 (Minn.1985), *cert. denied,* 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986). Upon such a showing, the state then bears the burden of overcoming the presumption of prejudice. *Id.*

■ In this case the trial court did not ask for or obtain appellant's consent to allow the jury to separate overnight during its deliberations, even though appellant had requested that the jury be sequestered at the start of the trial. Without informing counsel of its decision to allow the jury to separate, the court announced its decision to the jury at the end of its final instructions to the jury. Appellant's counsel promptly objected to the court's decision and claimed that he was concerned about the case's publicity, but the court stated that it had already determined that sequestration was unnecessary.

The trial court clearly erred in allowing the jury to separate without appellant's consent. However, appellant failed to show prejudice through evidence of pervasive publicity or other inappropriate outside influences on the jury. Further, the court cautioned the jury three separate times to avoid outside influences. Despite appellant's failure to make some showing of prejudice, we are reluctant to conclude that the trial court's failure to sequester the jury was harmless because of the existence of several other serious errors which also may have impacted appellant's right to a fair trial. *Cf. State v. Ware,* 498 N.W.2d 454, 459 (Minn.1993) (interests of justice required new trial because of synergy of questionable decisions by trial judge).

■ First, the bailiff had improper contact with the jury. Minnesota Rule of Criminal Procedure 26.03, subd. 5(1), states that court officers "shall not speak to or communicate with any juror concerning any subject connected with the trial nor permit any other person to do so." Although a court official's statements on the merits of a case raise a rebuttable presumption of prejudice, on review we will still consider the nature of the prejudicial matter, the number of jurors exposed to it, the weight of the evidence, and the likelihood that curative measures were effective. *State v. Cox,* 322 N.W.2d 555, 558–59 (Minn.1982).

In this case, the foreman requested the large diagram of Hjelman's house from the bailiff. The bailiff brought the diagram to the jury without informing the court of his actions. After relaying the jury's request to the court, the bailiff learned that the jury should not have received the large diagram because it had not been received into evidence. When removing the diagram the next morning, the bailiff compounded his error by telling the foreman "Maybe you should review the video." The foreman later told the other jurors why the large diagram had been removed from the jury room.

Upon learning of the contact, the trial court compelled both the bailiff and the foreman to testify as to the substance of their conversation. However, the court did not question any other jurors to determine what the foreman told them about the bailiff's statements. Although the bailiff's improper contact may be determined beyond a reasonable doubt not to have contributed to the verdict, *see Cox,* 322 N.W.2d at 558–59, the mere fact of the improper contact is still deeply troubling to us in light of the multiple errors that occurred during trial.

■ Compounding our concern about the bailiff's improper contact with the jury, the trial court erred when conducting the preliminary hearing on the bailiff's statements by not allowing appellant to be present at the hearing. Minnesota Rule of Criminal Procedure 26.03, subd. 1(1), gives

a defendant the right to be present at all stages of trial:

> The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence * * *.

The state's argument that the inquiry hearing is not a stage of trial because it was a post-trial hearing is not persuasive. *Cf. Kentucky v. Stincer*, 482 U.S. 730, 739–40, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (distinguishing competency hearing as a "pretrial proceeding" and therefore not a stage of trial is not helpful as it does not take into account the hearing's direct impact on the trial); *State v. Grey*, 256 N.W.2d 74, 76–77 (Minn.1977) (a pretrial suppression hearing is a stage of trial); *State v. Staveneau*, 158 Minn. 329, 330–31, 197 N.W. 667, 668 (1924) (judge's answer to jury questions after jury entered deliberations requires defendant's presence). The improper contact between the bailiff and the jury occurred prior to the rendering of the verdict. Just as a judge's answers to a jury's questions during its deliberations is a stage of trial, a hearing on a possible incident of jury tainting which the court becomes aware of before the verdict is rendered is also a stage of trial. As the preliminary inquiry was a stage of trial, the trial court erred by not insuring appellant's presence at the hearing.

■ Finally, the trial court erred when it failed to state on the record in a timely fashion its reasons for ordering appellant to wear a leg restraint at trial. Minnesota Rule of Criminal Procedure 26.03, subd. 2(c), governs the use of restraints:

> Defendants and witnesses shall not be subjected to physical restraint while in court unless the trial judge has found such restraint reasonably necessary to maintain order or security. A trial judge who orders such restraint, shall state the reasons on the record outside the presence of the jury.

■ While a trial court's failure to make timely findings on the record justifying the need for restraint is error, we will still examine the record to determine whether the trial court's decision to order restraints was objectively justified. *State v. Lehman*, 511 N.W.2d 1, 4 (Minn.1994) (error in trial court's record ordering restraints was harmless as restraints were objectively justified). Further, any error in ordering restraint "is not prejudicial absent evidence that the jury knew [the defendant] was wearing the restraint." *State v. Shoen*, 578 N.W.2d 708, 715 (Minn. 1998) (citing *State v. Scott*, 323 N.W.2d 790, 792 (Minn.1982)).

In this case, the trial court ruled before the trial began that appellant should wear an unobtrusive leg restraint, stating that the restraint would not "substantially hamper normal movement." The court further stated that it was "deferring to law enforcement with regard to the appropriateness of some form of restraint," but made no other findings on the record at the time to justify its ruling. After the trial was over and the verdict had been entered, the court *sua sponte* issued supplemental findings justifying its decision to order restraints. Those findings stated that appellant was involved in confrontations with another inmate and a jailer while in custody, appellant threatened the prosecutor, appellant became verbally aggressive with his attorneys and the media during the trial, and appellant told a witness' mother to "get the f* * * out of the courtroom." The court also stated in its findings that the leg restraint was virtually invisible, did not make any noise, and did not need adjustment to allow normal walking. Finally, the court found that appellant "showed no readily apparent signs that he was under any type of restraint" while in front of the jury.

■ While we acknowledge the thoroughness of the trial court's after-the-fact findings, the trial court's failure to justify its ruling in a timely manner on the record was error. The trial court is required to

make such findings in a timely manner in order to allow a defendant to challenge the reasons for the restraint. *See State v. Stewart*, 276 N.W.2d 51, 62 (Minn.1979). Still, appellant did not allege that the jury could have become aware of his restraint at trial, and the record does not indicate that appellant's restraint was visible to the jury in any way. Although the court's initial record for ordering restraint was insufficient, appellant has failed to plead adequate facts to require a remand for a *Schwartz* hearing. *See Shoen*, 578 N.W.2d at 715 (defendant must plead facts showing prejudice when making out claim for improper use of restraint before jury).

 Nonetheless, we are concerned that the cumulative effect of these errors may have deprived appellant of a fair trial. While we are not prepared to say at this time that any of the trial court's errors independently constitute reversible error or error requiring a *Schwartz* hearing, we conclude that the multiple errors' impact on the jury should be assessed in order to ensure appellant's right to a fair trial. In the interests of justice, we therefore hold that appellant is entitled to receive a *Schwartz* hearing for the limited purposes of determining: (1) whether the jurors were subject to any improper outside influences during their overnight separation;[1] (2) the nature and scope of the bailiff's improper contact with the jury; and (3) whether the jury became aware that appellant was wearing a leg brace for security purposes. We retain jurisdiction of this case, ordering that upon completion of the *Schwartz* hearing the trial court's findings

be certified to this court for inclusion in the appellate court file in this matter. The trial court shall file its findings within 90 days of this decision's filing, appellant shall file his brief in this court within 15 days of the trial court's filing, and respondent shall file its brief in this court 10 days thereafter.

Remanded for proceedings consistent with this opinion.

STRINGER, J. and PAGE, J., concurring specially.

STRINGER, Justice (concurring specially).

While I agree with the court's conclusion that appellant is entitled to a *Schwartz* hearing, I do not agree that it is necessitated by the cumulative errors committed by the trial court over the course of appellant's trial. In my opinion the trial court's error in allowing the jury to separate overnight during deliberations, without the appellant's consent, was sufficiently serious, standing alone, to require remand for a *Schwartz* hearing.

Rule 26.03, subd. 5(1) provides in plain and simple language: "With the consent of the defendant the court, in its discretion, may allow the jurors to separate over night during deliberation." *See also State v. Sanders*, 376 N.W.2d 196, 202 (Minn. 1985). The trial court violated this rule, the jury separated overnight and on review here the majority cites our ruling in *Sanders* to require the appellant to show prejudice in order to be entitled to a new

---

1. The concurrence essentially concludes that a violation of Rule 26.03, subd. 5(1), automatically entitles a defendant to a *Schwartz* hearing. That is not our current law. Rather, *Sanders* holds that there is no per se presumption of prejudice when the jury is permitted to separate over a defendant's objection. *Sanders*, 376 N.W.2d at 206. Although *Schwartz* hearings are to be liberally granted, in order to justify a *Schwartz* hearing a defendant still must establish "a prima facie case presenting 'sufficient evidence which, standing alone and unchallenged, would warrant the conclusion of jury misconduct.'" *State v. Church*, 577

N.W.2d 715, 720 (Minn.1998) (quoting *State v. Larson*, 281 N.W.2d 481, 484 (Minn.1979)). As *Sanders* holds that a presumption of prejudice does not automatically stem from a violation of Rule 26.03, subd. 5(1), a defendant requesting a *Schwartz* hearing after a jury has been allowed to separate over the defendant's objection still must make some showing of prejudice to warrant the hearing. The concurrence's conclusion, if adopted, would overrule *Sanders* by holding that a violation of Rule 26.03, subd. 5(1), creates a per se presumption of prejudice.

trial. The majority's reliance on *Sanders* is misplaced. First, unlike the situation in *Sanders*, the majority here is only ordering a *Schwartz* hearing, not a new trial. It is implementing the first step of the inquiry as to whether a new trial might be necessary—therefore I would conclude that the *Sanders* holding placing the burden on appellant to show prejudice is misguided.

Second, applying the *Sanders* holding puts the appellant in a perfect "Catch 22." Appellant is not entitled to a *Schwartz* hearing absent a showing of prejudice, but without a *Schwartz* hearing the appellant has no way of showing prejudice. He can only speculate as to improprieties that could have taken place while the jury was separated.[1]

Fundamental fairness requires a presumption of prejudice to the appellant entitling the appellant to a *Schwartz* hearing where the jury has been allowed to separate in violation of Rule 26.03, subd. 5(1), and, contrary to the ruling of the majority, the trial court's error in this regard need not have been embellished by its other errors in order to justify a *Schwartz* hearing.

PAGE, Justice (concurring specially).

I join in the special concurrence of Justice Stringer.

---

1. I would save for another day a consideration of the ruling in *Sanders* requiring proof of prejudice as a predicate for a new trial based upon a violation of Rule 26.03, subd. 5(1).