*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1126**

State of Minnesota,
Respondent,

vs.

Gregory Brian-Will Thompson,
Appellant.

**Filed August 11, 2014
Reversed and remanded
Stauber, Judge**

Beltrami County District Court
File No. 04CR121072

Lori Swanson, Minnesota Attorney General, St. Paul, Minnesota; and

Timothy R. Faver, Beltrami County Attorney, Annie P. Claesson-Huseby, Assistant County Attorney, Bemidji, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jessica Merz Godess, Assistant State Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Worke, Presiding Judge; Stauber, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

**STAUBER**, Judge

On appeal from his convictions of two counts of knowingly permitting the continuing sexual abuse of a child under Minn. Stat. § 609.378, subd. 1(a)(2) (2010),

appellant argues that the evidence was insufficient to sustain his convictions. Appellant also contends that the district court committed reversible error by (1) failing to instruct the jury on the definition of sexual abuse; (2) allowing the state to introduce evidence of his prior gross-misdemeanor conviction of fifth-degree assault, and compounding that error by admitting an inflammatory photograph depicting the victim's injuries; and (3) allowing one of the minor perpetrators of the alleged sexual abuse to appear before the jury and provide testimony while visibly shackled. Because we conclude that the district court committed prejudicial error by allowing the state to introduce evidence of appellant's prior gross-misdemeanor conviction, and by allowing a state's witness to appear before the jury and provide testimony while visibly shackled, we reverse and remand for a new trial.

**FACTS**

Appellant Gregory Brian-Will Thompson married Deborah Thompson (hereinafter "Ms. Thompson") in October 2008. At the time of the marriage, appellant had two sons of Native American heritage whom he had adopted in 2003, D.T., born March 10, 1995, and A.T., born November 9, 1996. Ms. Thompson also brought children into the marriage, two biological children and five adopted children. Ms. Thompson's adopted children included S.M., T.M., born May 5, 1995, and A.M., who was two years younger than T.M., and their brother, R.M. All were of African American heritage. After appellant and Ms. Thompson were married, they had one biological daughter together.

A.T. and D.T. had been sexually abused in their biological home and had demonstrated poor sexual boundaries prior to appellant and Ms. Thompson's marriage.

2

Shortly after the marriage, in November 2008, T.M. told her therapist that D.T. had touched her inappropriately. The matter was reported to Beltrami County Health and Human Services (BCHHS), which conducted an investigation. After interviewing appellant, Ms. Thompson, T.M., A.T., and D.T., BCHHS determined that D.T. had touched T.M.'s breast in response to a dare made by A.T., but it "did not determine that ABUSE occurred or that child protective services [were] needed."

In April 2012, appellant was charged with one count of neglect or endangerment of a child in violation of Minn. Stat. § 609.378, subd. 1(a)(2). The complaint was later amended to add a second count alleging child neglect or endangerment. The charges were based on allegations that appellant knowingly permitted the continuing sexual abuse of T.M. (Count I) and A.M. (Count II), by A.T. and D.T.

At trial, T.M. testified that at a family reunion in 2008, A.T. and D.T. began asking her if they could touch her breasts and if they could have sex with her. T.M. testified that after the reunion, A.T. and D.T. continued to proposition her for sex on a regular basis. T.M. also testified that A.T. and D.T. touched her breasts and that she told appellant about "these issues" three "times or more or so." T.M. testified that when she would tell appellant about the boys' conduct, appellant would discipline the boys by making them put "their head[s] on the table for a certain amount of time," or write "a Bible verse." According to T.M., she "eventually stopped" telling appellant about the boys' conduct because "nothing" appellant did "was helping."

In addition to the propositions for sex and inappropriate touching, T.M. claimed that A.T. would masturbate "in his room, or on the couch upstairs, or in the bathroom."

3

According to T.M., she "saw him" masturbate, and could also "hear him" because "he was being loud about it." T.M. testified that when she told appellant about A.T.'s conduct, appellant "took the door off the upstairs" bathroom, and implemented a rule that the girls had to bring a partner with them when they went upstairs. But appellant's responses did not cause "the masturbation issue to stop."

T.M. testified that "eventually" A.T. and D.T. had sex with her in her bathroom. According to T.M., she approached her parents twice in the middle of the night in 2010, and told them that she had just been raped in the bathroom. Both times she was accompanied by her older sister, S.M. In her first report, T.M. told her parents that her assailant was a stranger, but she later claimed that the assailant was A.T. In her second report, however, T.M. told her parents that the assailant was D.T. T.M. claimed that neither appellant nor her mother believed that she had been sexually assaulted.

T.M. further testified that despite A.T. and D.T.'s conduct, appellant never put her or A.T. in therapy, and never called BCHHS or the police. In fact, T.M. testified that one of the family rules was that "family matters are supposed to stay in the house," and that she and her siblings were instructed not to talk about family matters with mandatory reporters. But in March 2012, T.M. told P.J., a woman at her church, about some of the conduct going on at the home. P.J. relayed the conversation to a church elder, which led to the criminal charges against appellant.

A.M. testified that A.T. first propositioned her for sex in 2008, at the reunion. A.M. claimed that this conduct continued over time, and that A.T. asked to touch her

4

breasts or have sex with her about five times. According to A.M., she told appellant about A.T.'s conduct, but it did not stop.

A.M. also testified about a specific incident that occurred in the upstairs "schoolroom," where the children, who were homeschooled, "usually did their school." According to A.M., she was sitting at the table and A.T. was sitting on the couch when A.T. asked her if he could "suck [her] breast." A.M. responded by telling him to stand up so she could "punch him in the nose." A.T. then stood up with his pants unzipped, exposing his erect penis. A.M. testified that she immediately ran downstairs and told appellant, who responded by calling a family meeting and admonishing A.T. A.M. claimed that appellant also implemented new rules that T.M. and A.M. would have to do their schoolwork in their room, that "the boys got to do their school upstairs," and that "at least four had to be upstairs at one time."

Like T.M., A.M. testified about A.T.'s masturbating. A.M. stated that A.T. would masturbate in his bedroom or in the upstairs bathroom, and that although she "knew" he was masturbating, she was not "exposed to [it] directly." A.M. also testified that when she complained to appellant about A.T.'s conduct, he told A.T. that it "wasn't acceptable" to masturbate in the upstairs bathroom, and that he took the door off the upstairs bathroom in order to "stop that from happening." But A.M. testified that the masturbation did not stop, that appellant did not seek help for her or A.T., and that appellant did not contact BCHHS or law enforcement.

A.T. testified for the state and admitted to propositioning T.M. for sex and having "issues" with masturbation that offended his step-siblings. A.T. also testified that he was

"talked to at least three times" regarding his "conduct," that appellant told him his behavior was "unacceptable," and that as a consequence for his actions, he was "told to do Bible verses" and "other assignments of writing essays." A.T. further admitted to "being narcissistic, being more prone to depression, and . . . having ADHD."

Following A.T.'s testimony, appellant moved for a mistrial because A.T. testified in front of the jury "in a waist belt with handcuffs to the waist belt." The district court denied the motion, finding that "[c]learly the witness has shown his behavior would have endangered the courtroom had he not been" restrained.

Appellant testified in his own defense and claimed that he heard at the 2008 reunion that A.T. told T.M. that "if we have sex, we will dishonor my father and our parents won't be able to get married." According to appellant, that "was the only time [he] ever heard an actual solicitation for sex." Appellant also claimed that the only time he was made aware of any inappropriate touching was in 2008 when BCHHS found that no sexual abuse occurred when A.T. touched T.M.'s breast on a dare, and an incident where A.T. touched T.M. while she was waiting for the bathroom. Regarding the latter incident, appellant explained that after talking with T.M., he believed A.T. was "just pestering" T.M.

Appellant testified that he was aware of three additional instances involving A.T. exhibiting inappropriate sexual behavior: two occasions when the girls complained of A.T. masturbating and the incident in which A.T. exposed himself to A.M. Appellant stated that in response to this behavior, he took the door off the upstairs bathroom and instituted rules to ensure that A.M. and T.M. were not left unsupervised with A.T. and

6

D.T. Appellant claimed that to his knowledge, the masturbatory behavior stopped after the change in rules.

Appellant's testimony also addressed T.M.'s claim that she was raped. Appellant testified that T.M. and S.M. woke him in the middle of the night and that T.M. claimed that "she was just raped by a stranger." According to appellant, he "checked all the windows and doors" and concluded that "a stranger or intruder had not come into the home." Appellant stated that he thought "maybe it was a nightmare." Regarding the second incident when T.M. claimed that she had been raped by D.T., appellant testified that he was initially "pretty concerned," but ultimately concluded that nothing had happened. Appellant stated that he reached this conclusion after talking with T.M., S.M., and D.T.

On cross-examination, appellant admitted that after adopting A.T. and D.T., but before he was married, he became aware that the boys had previously been sexually abused. Appellant also admitted that before he was married, he was aware that the boys had engaged in inappropriate sexual behavior. Appellant further admitted that after he married Ms. Thompson, the boys stopped attending counseling, and that at no point did he seek help outside of the home. And, appellant admitted that the youngest child slept in the same room with him and Ms. Thompson, and that he and his wife had a policy to never leave the youngest child unsupervised with the older children. Moreover, after appellant testified regarding his views on spanking, and save for a couple exceptions, his decision when he married Ms. Thompson to no longer spank his children, the state introduced impeachment evidence in the form of appellant's 2006 gross-misdemeanor

7

conviction of fifth-degree assault for spanking his special-needs foster child. When asked by the state, appellant admitted that he spanked the child "multiple times with an object" leaving marks on the child's backside. And over defense objection, the district court admitted a photograph of the child with his pants down depicting the marks on his backside.

The jury found appellant guilty of the charged offenses. The district court then imposed consecutive probationary sentences with a variety of conditions, including serving 120 days in jail. This appeal followed.

**D E C I S I O N**

**I.    Sufficiency of the Evidence**

When reviewing the sufficiency of evidence to support a conviction, this court conducts "a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction," is sufficient to allow jurors to reach a verdict of guilty. *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012) (quotation omitted). We assume that "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Caldwell*, 803 N.W.2d 373, 384 (Minn. 2011) (quotation omitted). This court "will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense." *Ortega*, 813 N.W.2d at 100.

Appellant was convicted of two counts of child neglect or endangerment under Minn. Stat. § 609.378, subd. 1(a)(2). This statute provides that "[a] parent . . . who

8

knowingly permits the continuing . . . sexual abuse of a child is guilty of neglect of a child." *Id.*

Appellant first argues that the evidence was insufficient to support his convictions because "although the state proved that A.T. and D.T. said and did things of a sexual nature, their acts did not constitute 'sexual abuse' within the meaning of the statute." Appellant also contends that even if the acts did constitute sexual abuse, the state "failed to prove that [he] knowingly permitted them."

Appellant's argument raises a question of statutory construction, which is a legal determination subject to de novo review. *State v. Colvin*, 645 N.W.2d 449, 452 (Minn. 2002). When interpreting a statute, words and phrases are given their plain and ordinary meaning. *State v. Nelson*, 842 N.W.2d 433, 437 (Minn. 2014). If a statute is unambiguous, the statute's plain meaning is applied. *State v. Hayes*, 826 N.W.2d 799, 804 (Minn. 2013). If, on the other hand, a statute is susceptible to more than one reasonable interpretation, then the statute is ambiguous and we may consider the canons of statutory construction to ascertain its meaning. *Id.* Penal statutes must be construed strictly, with any reasonable doubt resolved in favor of the defendant. *State v. Olson*, 325 N.W.2d 13, 19 (Minn. 1982).

Appellant asserts, and the state agrees, that the phrase "sexual abuse" is not defined by the neglect statute or the criminal code. *See* Minn. Stat. § 609.378 (2010) (neglect or endangerment of child); *see also* Minn. Stat. § 609.02 (2010) (criminal code definitions). The phrase "sexual abuse" is, however, defined by the reporting of maltreatment of minors statute. *See* Minn. Stat. § 626.556, subd. 2(d) (2010) (defining

9

sexual abuse). Appellant argues that because the neglect statute is in pari materia with the reporting of maltreatment of minors statute, they must be construed together.

We agree. "'The doctrine of *in pari materia* is a tool of statutory interpretation that allows two statutes with common purposes and subject matter to be construed together to determine the meaning of ambiguous statutory language.'" *State v. Leathers*, 799 N.W.2d 606, 611 (Minn. 2011) (quotation omitted). The statutes at issue here, the child neglect statute and the maltreatment of minors statute, are in pari materia because they both govern the sexual abuse of children; one prohibits the conduct and the other requires the reporting of the conduct. *Compare* Minn. Stat. § 609.378, *with* Minn. Stat. § 626.556.

The reporting of maltreatment of minors statute defines sexual abuse as "the subjection of a child by a person responsible for the child's care, by a person who has a significant relationship to a child . . . to any act which constitutes" first, second, third, fourth, or fifth-degree criminal sexual conduct under Minn. Stat. §§ 609.342-.3451 (2010). Minn. Stat. § 626.556, subd. 2(d). Sexual abuse also includes "threatened sexual abuse." *Id.*

Appellant argues that under the definition of "sexual abuse" contained in the reporting of maltreatment of minors statute, A.T. and D.T.'s acts did not constitute "sexual abuse," and even if some of the instances did constitute sexual abuse, appellant did not knowingly permit them to continue. Because appellant was convicted of two counts of child neglect under section 609.378, subdivision 1(a)(2), Count I involving

10

T.M. as a victim, and Count II involving A.M. as a victim, we will address each count individually.

### A. Count I involving T.M.

T.M. testified extensively about A.T. and D.T.'s sexual behavior, including their propositioning of T.M. for sex and A.T's masturbating where T.M. could see him. Although inappropriate, this behavior does not meet the definition of sexual abuse because it does not violate sections 609.342-.3451. *See* Minn. Stat. § 626.556, subd. 2(d).

Nonetheless, under Minn. Stat. § 609.3451, subd. 1(2), a person is guilty of fifth-degree criminal sexual conduct if he "engages in masturbation . . . in the presence of a minor under the age of 16, knowing or having reason to know the minor is present." And a person is also guilty of fifth-degree criminal sexual conduct if he engages in "nonconsensual sexual contact." Minn. Stat. § 609.3451, subd. 1(1). Included in the definition of "sexual contact" is the intentional touching of the complainant's intimate parts "with sexual or aggressive intent." Minn. Stat. § 609.341, subd. 11 (2010).

Here, T.M. testified that A.T. and D.T. touched her breasts and that she "saw" A.T. masturbating, indicating that he was performing the act in her presence. Because this conduct could violate section 609.3451, subdivision 1, it would fall within the definition of sexual abuse contained in section 626.556, subdivision 2(d). And, more importantly, T.M. testified that both A.T. and D.T. had sex with her in the bathroom. This testimony establishes a violation of sections 609.342-.3451, and therefore qualifies as sexual abuse within the meaning of the child neglect or endangerment statute.

11

Appellant argues that even if some of A.T. and D.T.'s conduct satisfies the definition of sexual abuse, the state failed to prove that he knowingly permitted the abuse to continue. We disagree. When a criminal statute includes "some form of the verb[] 'know,'" intent becomes an element of the crime and is demonstrated by proving "that the actor *believes* that the *specified fact* exists." Minn. Stat. § 609.02, subd. 9(1), (2) (2010) (emphasis added). But "'[k]nowingly' is not defined in Minnesota's criminal code." *State v. Gunderson*, 812 N.W.2d 156, 160 (Minn. App. 2012). Nonetheless, the supreme court recently acknowledged that the "word 'knowingly' derives from the word 'know,' which means 'to perceive directly; grasp in mind with clarity or certainty.'" *State v. Watkins*, 840 N.W.2d 21, 29 (Minn. 2013) (quoting *The American Heritage Dictionary of the English Language* 970 (4th ed. 2006)). In *Watkins*, the supreme court interpreted "knowingly violates this subdivision" from a domestic abuse statute "to require the defendant to perceive directly that the contact violated the . . . statute." *Id.*

Likewise, the term "permitting" is not defined in the criminal code. But basic canons of statutory construction instruct that words and phrases must be given their plain and ordinary meaning. *Nelson*, 842 N.W.2d at 437. The plain and ordinary meaning of "permit" is "[t]o allow the doing of (something); consent to." *The American Heritage Dictionary of the English Language* 1315 (5th ed. 2006).

Here, the record reflects that appellant knew A.T. and D.T.'s sexual histories and propensities but encouraged the children not to talk to mandatory reporters and to refrain from discussing family matters with anyone outside of the family. The record also reflects that appellant was apprised of (1) at least two incidents in which A.T.

12

inappropriately touched T.M.; (2) at least two incidents in which A.T. sexually propositioned A.M. and T.M.; (3) A.T.'s failure to keep his masturbatory habits private; (4) A.T.'s exposure of his erect penis to A.M.; and (5) T.M.'s claim that she was raped by a stranger in the bathroom in the middle of the night, and her later claim that D.T. raped her in the bathroom. Yet, despite knowing all this information, appellant chose not to seek help outside of the home, which is particularly troubling after the rape allegations. Thus, in light of the totality of the circumstances presented here, we conclude that the evidence was sufficient for a jury to reasonably conclude that appellant was guilty of Count I of the complaint—knowingly permitting the continuing sexual abuse of T.M. by A.T. and D.T.

**B.     Count II involving A.M.**

The evidence supporting appellant's conviction of Count II, however, is less convincing. A.M. testified that A.T. propositioned her for sex about five times and that she "knew" that A.T. would masturbate in his bedroom or in the bathroom. But this conduct would not constitute sexual abuse within the meaning of the child neglect or endangerment statute, and the record evidence does not show that A.T. threatened to force A.M. to have sex with him. As addressed above, A.T.'s mere sexual propositioning of A.M. does not constitute sexual abuse because it does not violate sections 609.342-.3451. Moreover, to be guilty of fifth-degree criminal sexual conduct under Minn. Stat. § 609.3451, subd. 1(2), the individual must engage "in masturbation or lewd exhibition of the genitals in the presence of a minor under the age of 16, knowing or having reason to know the minor is present." Here, although A.M. claimed that she "knew" A.T. was

13

masturbating, A.M. admitted that she was not "exposed to [it] directly." Nor did A.T., who testified for the state, discuss whether he was aware of A.M.'s presence when he masturbated. Consequently, A.T.'s conduct would not support a conclusion that A.T. violated section 609.3451 because it was not done in A.M.'s presence. *See* Minn. Stat. § 609.3451, subd. 1(2) (requiring for fifth-degree criminal sexual conduct conviction that the offender engage in masturbation "*in the presence* of a minor" (Emphasis added.)).

Nonetheless, A.M. testified that on one occasion A.T. exposed his erect penis to her after asking if he could "suck [her] breast." Because A.M. was under the age of 16 when A.T. exposed himself to her, this conduct could violate section 609.3451, subdivision 1(2). Thus, A.T.'s indecent exposure conduct could constitute sexual abuse within the meaning of section 609.378, subdivision 1(a)(2). Moreover, the record reflects that appellant knew that A.T. and D.T. had poor sexual boundaries and that they acted out sexually toward A.M. and T.M. as early as 2008. The record further reflects that appellant knew of the ongoing sexualized behavior exhibited by A.T. and D.T. And, despite appellant's somewhat unorthodox efforts to curb this behavior, the record reflects that the behavior continued.

We note that the state erroneously suggests that appellant knowingly permitted the sexual abuse to continue by not involving the government. But the statute criminalizes knowingly permitting the continuing sexual abuse of a child. *See* Minn. Stat. § 609.378, subd. 1(a)(2). It does not state that an individual knowingly permits the sexual abuse of a child "by not involving the government." *See id.*; *see also Olson*, 325 N.W.2d at 19 (requiring strict construction of penal statutes). Here, however, appellant, as the victims'

14

parent, was obligated to make credible efforts to protect the girls from sexual abuse.[1]  In light of appellant's knowledge that A.T. and D.T. continued to exhibit sexual behavior toward A.M. and T.M., the jury could reasonably conclude that appellant failed to take such steps.  And this conclusion was likely aided by the number of leading questions posed by the state.  Accordingly, although weak, we conclude that the evidence was sufficient to sustain appellant's conviction of Count II of the complaint—knowingly permitting the continuing sexual abuse of A.M. by A.T. and D.T.

## II.    Trial Errors

Appellant argues that the district court abused its discretion by (1) failing to instruct the jury on the definition of sexual abuse; (2) admitting his prior conviction of fifth-degree assault as impeachment evidence; and (3) allowing A.T. to testify in front of the jury while visibly restrained.  Appellant contends that these trial errors were prejudicial and, therefore, he is entitled to a new trial.

### A.    Jury instructions

A district court must instruct the jury in a way that "fairly and adequately explain[s] the law of the case" and does not "materially misstate[] the applicable law." *State v. Koppi*, 798 N.W.2d 358, 362 (Minn. 2011).  A district court has "considerable latitude" in selecting language for jury instructions.  *State v. Gatson*, 801 N.W.2d 134, 147 (Minn. 2011) (quotation omitted).  This court applies an abuse-of-discretion standard of review to a district court's jury instructions.  *Koppi*, 798 N.W.2d at 361.

---

[1] The record indicates that A.M. and T.M. may have fashioned weapons to defend themselves.

15

The district court instructed the jury as follows: "The elements of neglect of a child by knowingly permitting continuing physical or sexual abuse are, first; the defendant knowingly permitted the continual sexual abuse of [T.M.]. You may consider these terms as having their common ordinary meanings." No further instruction on the definition of sexual abuse was provided.[2]

Appellant failed to object to the jury instructions. "Failure to object to jury instructions may result in waiver of the issue on appeal," "[b]ut [an appellate court has] discretion to review instructions not objected to at trial if the instructions contain plain error affecting substantial rights or an error of fundamental law." *State v. Scruggs*, 822 N.W.2d 631, 642 (Minn. 2012) (quotation omitted). An appellate court "will order a new trial only if all three prongs of the plain error standard are satisfied and the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotation omitted).

Appellant argues that because "sexual abuse" is an essential element of the crime of child neglect or endangerment, the district court erred by failing to provide a definition of sexual abuse. We agree. "[J]ury instructions must define the crime charged and explain the elements of the offense to the jury." *State v. Vance*, 734 N.W.2d 650, 656 (Minn. 2007), *overruled on other grounds by State v. Fleck*, 810 N.W.2d 303 (Minn. 2012); *State v. Kuhnau*, 622 N.W.2d 552, 556 (Minn. 2001). But "detailed definitions of the elements to the crime need not be given in the jury instructions if the instructions do

---

[2] The district court repeated this instruction for the count involving A.M.

not mislead the jury or allow it to speculate over the meaning of the elements." *Peterson v. State*, 282 N.W.2d 878, 881 (Minn. 1979).

Here, to be found guilty of child neglect or endangerment, the state was required to prove, beyond a reasonable doubt, that A.M. and T.M. were sexually abused or threatened with sexual abuse, and that appellant knowingly permitted the continual sexual abuse of the girls. The district court's instruction included but did not explain the element of "sexual abuse." The term "sexual abuse" is a vague term. By not explaining the meaning of "sexual abuse," the jury had to speculate over its meaning. An instruction is erroneous if it is misleading or confusing on fundamental points of law. *State v. Caine*, 746 N.W.2d 339, 354 (Minn. 2008). Therefore, this jury instruction was erroneous because it did not explain or define all of the essential elements of the crime.

However, a conclusion that the district court erred does not end our analysis; rather, the next step in our analysis is to determine whether the error was plain. An error is plain if it is "clear" or "obvious," meaning that it "contravenes caselaw, a rule, or a standard of conduct." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). And, a jury instruction is not necessarily insulated from plain error because it follows the applicable model jury instructions. *State v. Gunderson*, 812 N.W.2d 156, 162 (Minn. App. 2012).

The jury instruction provided by the district court followed the model jury instruction provided in 10 *Minnesota Practice*, CRIMJIG 13.90 (2006). The district court also instructed the jury that "[y]ou may consider these terms as having their common ordinary meanings." But, the CRIMJIG, the criminal-neglect statute, and the criminal code fail to provide a definition of the term "sexual abuse." And although the

maltreatment of minors statute provides a definition of the term "sexual abuse," appellant's trial counsel did not request such an instruction. Because neither the criminal-neglect statute nor the criminal code defined "sexual abuse," and there is no caselaw requiring that an explanation of the term "sexual abuse" be given when instructing the jury on the elements of the child neglect or endangerment statute, we conclude that the error was not plain.

### B. Impeachment evidence

A witness may be impeached with evidence of a prior conviction *only* if the conviction was a felony or if the conviction involved a crime of dishonesty *and* "the court determines that the probative value of admitting this evidence outweighs its prejudicial effect." Minn. R. Evid. 609(a)(1). District courts are afforded discretion in determining, under rule 609(a)(1), what prior convictions are admissible. *State v. Gassler*, 505 N.W.2d 62, 67 (Minn. 1993). A ruling on the admissibility of prior convictions for purposes of impeachment is reviewed for an abuse of discretion. *State v. Swanson*, 707 N.W.2d 645, 654 (Minn. 2006).

Appellant argues that the district court abused its discretion by allowing the state to impeach him with his prior conviction of fifth-degree assault because the state failed to establish that the conviction was a felony-level offense. Appellant also contends that even if his prior conviction was "somehow admissible," the district court erred by allowing the state to elicit evidence concerning the facts underlying his prior conviction.

And appellant claims that the "district court further compounded its error by admitting the graphic photograph of the boy's naked, bruised buttocks." We agree.[3]

The record reflects that appellant was convicted of fifth-degree assault in 2006. The offense was a gross misdemeanor and was not a crime of dishonesty. Thus, the offense was not admissible for impeachment purposes under rule 609(a)(1).

Moreover, the erroneous admission of the impeachment evidence was further compounded by the admission of the inflammatory photograph. Under the rules of evidence, the district court may exclude evidence if its probative value is substantially outweighed by the danger of *unfair* prejudice. Minn. R. Evid. 403. Unfair prejudice means an "unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *State v. Buggs*, 581 N.W.2d 329, 336 (Minn. 1998) (quotation omitted). Photographs may be unduly prejudicial if they are excessively explicit, inflammatory, or graphic. *Id.* at 336-37.

Here, the photograph was inflammatory; it depicted the special-needs boy, who was a former foster child of appellant, with his pants down and shirt pulled up showing the black-and-blue marks on his backside. And the danger for unfair prejudice is obvious because the photograph involved the polarizing issue of child spanking. Moreover, the photograph was unnecessary considering that the state elicited testimony from appellant describing the offense. Although the state claims the admission of the photograph was

---

[3] While we agree that impeachment of appellant for his fifth-degree assault conviction was improper under Minnesota Rule of Evidence 609, we do not agree that appellant could not be impeached under Minnesota Rule of Evidence 613 for his prior inconsistent testimony after he opened the door relative to his views on spanking.

necessary because appellant only admitted that his spanking of the special-needs boy left red marks rather than black-and-blue marks, the probative value of the inflammatory photograph was substantially outweighed by the danger of unfair prejudice. *See* Minn. R. Evid. 403. Accordingly, the district court abused its discretion by admitting the photograph.

### C. A.T.'s testimony while visibly restrained

Appellant argues that the district court "committed reversible error" by allowing A.T. "to appear before the jury and provide testimony while visibly shackled." "The exposure of a jury to potentially prejudicial material creates a problem of constitutional magnitude, because it deprives a defendant of the right to an impartial jury . . . ." *State v. Varner*, 643 N.W.2d 298, 304 (Minn. 2002) (quotation omitted). Because the use of restraints is "an inherently prejudicial practice," it is constitutionally permissible "only when justified by an essential state interest specific to each trial." *State v. Shoen*, 578 N.W.2d 708, 713 (Minn. 1998) (quotation omitted). And the rules of criminal procedure provide that "[d]efendants and witnesses must not be subjected to physical restraint while in court unless the court: (1) [f]inds the restraint necessary to maintain order or security; and (2) [s]tates the reasons for the restraints on the record outside the hearing of the jury." Minn. R. Crim. P. 26.03, subd. 2(c). The rules further provide that "[i]f the restraint is apparent to the jury, and the defendant requests, the judge must instruct the jury that the restraint must not be considered in reaching the verdict." *Id.*, subd. 3(d).

However, while it is error to require a defendant to wear restraints without stating reasons on the record, this court will examine the record to determine if the decision was

objectively justified.  *State v. Lehman*, 511 N.W.2d 1, 3 (Minn. 1994).  If the record supports the district court's decision, the error is harmless.  *Id.*

Here, the record reflects that the district court allowed A.T. to testify before the jury while visibly restrained without first making a finding on the record, outside the presence of the jury, that such restraints were reasonably necessary.  Although the state claims that everyone was caught by surprise when A.T. entered the courtroom wearing shackles, the state "concedes" this error.  But the state argues that the error was harmless because the district court made the required findings, "albeit late," and the findings that the restraints were necessary are supported by the record.

We disagree.  The district court found that A.T. "has shown his behavior clearly would have endangered the courtroom had he not been in . . . a waist belt with handcuffs to the waist belt."  But the district court cited no specific behavior or history supporting this finding, nor can we find any support for this finding in the record.  Although the record reflects that A.T. was uncooperative in answering the prosecutor's questions, and often provided incoherent responses, there is nothing in the record indicating that A.T. made any aggressive statements or movements, or otherwise presented an imminent danger to others.  We further note that despite the state's claim that everyone was caught by surprise when A.T. was brought into the courtroom in shackles, it is the prosecutor's obligation to prepare her witnesses and to present them before the jury in a non-prejudicial manner.  And it is the duty of the court to ensure against such prejudice.  Thus, the court should have immediately recessed in order to attempt to mitigate the prejudice to appellant.

21

### D. Prejudice

Appellant further argues that the trial errors were prejudicial, which entitle him to a new trial. We agree. Although each trial error may not be sufficiently prejudicial to require a new trial, we conclude that the cumulative effect of these errors clearly warrants a new trial. *See State v. Jackson*, 714 N.W.2d 681, 698 (Minn. 2006) (stating that if an appellant establishes that a district court committed two or more procedural errors, none of which individually require a new trial, the appellant nonetheless may be entitled to a new trial "if the errors, when taken cumulatively, had the effect of denying appellant a fair trial"). As addressed above, the evidence supporting appellant's convictions was not overwhelming, particularly in light of the vagueness of the term "sexual abuse," and the specific language contained in section 609.378, subdivision 1(a)(2), requiring that the offender "knowingly permit[] the continuing . . . sexual abuse." Moreover, the erroneous admission of appellant's prior gross misdemeanor conviction is very troubling because of the similarity between the prior non-felony offense and the charges in this case. The offenses are similar in nature because they both involve appellant's parenting of children. The similar nature of the offenses presents a much higher likelihood that the jury would convict based solely upon hearing evidence of the prior conviction. And that error was further compounded by the extremely inflammatory photograph presented to the jury.

Finally, by requiring A.T. to testify while visibly restrained, the jury undoubtedly got the erroneous impression that A.T. was a very dangerous person. Such an impression likely impacted the jury's decision to find appellant guilty of knowingly permitting the alleged continuous sexual abuse of A.M. and T.M. These errors deprived appellant of his

right to a fair trial.  Accordingly, we reverse and remand for proceedings not inconsistent with this opinion.[4]

**Reversed and remanded.**

---

[4] Because a new trial is warranted, the instructions to the jury on remand should include a definition of the "sexual abuse" element of the offense.